# FOR PUBLICATION



ATTORNEY FOR APPELLANT:

**KIMBERLY A. JACKSON**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**BRIAN REITZ**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

JASON MICHAEL PALILONIS,           )
                                   )
    Appellant-Defendant,           )
                                   )
        vs.                  )      No. 42A05-1104-CR-197
                                   )
STATE OF INDIANA,                  )
                                   )
    Appellee-Plaintiff.            )

APPEAL FROM THE KNOX SUPERIOR COURT
The Honorable W. Timothy Crowley, Judge
The Honorable Sherry B. Gregg Gilmore, Special Judge
Cause No. 42D01-0509-FC-190

**June 20, 2012**

**OPINION - FOR PUBLICATION**

**VAIDIK, Judge**

**Case Summary**

Jason Palilonis was convicted of Class B felony rape for raping a fellow Vincennes University student after a night where both had been drinking. A year after the incident, the victim, B.S., committed suicide. At trial, statements Palilonis made to the police, statements B.S. made to the nurse during her sexual-assault examination, and evidence of B.S.'s death were admitted into evidence over Palilonis's objections. Testimony from a nurse vouching for the credibility of B.S.'s statements about the rape was also admitted, but without any objection from Palilonis. The jury found Palilonis guilty, but four days later a juror alleged juror misconduct, specifically that the foreperson told the jury the judge thought Palilonis was guilty and some of the jurors were aware that B.S. had committed suicide. Evidentiary hearings were held, and the trial court found that no misconduct occurred. This was the correct course of action for the trial court to take in this situation, and Palilonis's argument is merely asking us to reweigh the evidence adduced at the evidentiary hearings, which we may not do.

We also hold that the trial court did not err in admitting evidence of B.S.'s death, as this was the fairest resolution for both parties of the issue of why B.S. was not testifying at trial. Finally, we find that the statements B.S. made to the nurse during her sexual-assault examination are admissible under Evidence Rule 803(4) and the reasoning in *Perry v. State*, 956 N.E.2d 41 (Ind. Ct. App. 2011), for the description of the events of the rape.

**Facts and Procedural History**

2

On September 22, 2005, Palilonis, a twenty-year-old Vincennes University student, was drinking alcohol with other students at his apartment. Among those students was twenty-one-year-old B.S. At some point that night, Palilonis and B.S. had sex in his bathroom and were discovered by Palilonis's girlfriend. B.S. went to Palilonis's bedroom, but Palilonis told her that she had to leave. B.S. went to the living room and fell asleep on the couch. Palilonis also fell asleep and awoke the next morning to find B.S. "passed out" and "half naked" on his couch. Tr. p. 1005-06, 1008. Palilonis said that he remained in his apartment until B.S. left. *Id.* at 1014.

The next night, both Palilonis and B.S. were at another nearby party. There were approximately thirty to fifty students there, including B.S.'s friends Matt Devarenne, Brice Basford, and Andrew Bryant. At the party, the students were playing beer pong, a drinking game. B.S. had more than five alcoholic drinks and became very intoxicated. Around midnight or one o'clock in the morning, Basford walked B.S. back to his nearby apartment so that she could go to sleep. She took off her jeans and passed out face down on a couch. Basford left B.S. asleep on the couch and went next door to a friend's apartment.

About an hour later, Devarenne drove a group of students from the party back to Basford's apartment. Palilonis arrived a short while later. At this time, B.S. was still passed out on her stomach on the couch. One of the residents of the apartment indicated that he was going to bed, so the guests left the apartment. Devarenne, however, returned to the apartment later and noticed that it was darker than normal. *Id.* at 891-92. Devarenne saw Palilonis's head over the approximately three-foot-high brick wall that

3

separated the couch from the entryway, and Palilonis told Devarenne to be quiet. Devarenne moved closer to the couch and saw Palilonis squatting behind B.S., holding her in position and penetrating her vagina with his penis. *Id.* at 893-95. B.S. was still face-down on the couch and not making any noise. *Id.* at 894-95.

Devarenne yelled for his friends, but no one answered, so he went next door and told his friends that Palilonis was raping B.S. Basford, Devarenne, Bryant, and others went back to the apartment. Palilonis was still on top of B.S., and B.S. was still not moving. Basford saw Palilonis raping B.S., asked him what he was doing, and told him to "get the f*** out of my house." *Id.* at 899, 933. Palilonis put on his pants and fled from the apartment. B.S. woke up, distraught, and yelled "Oh my God, guys, how could you let this happen to me?" *Id.* at 908. She then ran crying to a friend's apartment nearby.

Devarenne, Basford, Bryant, and another friend left the apartment and went over to Palilonis's apartment. Basford and Bryant beat Palilonis up. They later returned with B.S., who, according to Devarenne, repeatedly slapped Palilonis. *Id.* at 911-12. Palilonis's roommate called the police.

Police arrived around 5:30 a.m. B.S. was transported to the Good Samaritan Hospital Emergency Room where she underwent a sexual-assault examination. B.S. told Tammy Freeman, the examining nurse, the details of what had happened during her rape. Specifically, B.S. said that she went to sleep on the couch at the apartment, and she "woke up and found a male that [she] had met last evening on top of [her]." State's Ex. 52. She also said that "he had vaginal sex with [her]." *Id.*

4

During the physical examination of B.S., Freeman found that B.S. had bruises on her arm and a large amount of discharge in her vagina. Tr. p. 860, 989. A vaginal smear slide confirmed the presence of seminal material in her vagina, but the vaginal wash, rectal smear slide, oral swab, and external genital swabs did not. State's Ex. 50-51. DNA testing did not identify the sperm contributor. Tr. p. 750-51, 755, 796. Sperm was also not detected on the couch where Palilonis and B.S. had been, and testing did not produce any evidence of foreign hair, debris, or secretions on B.S.'s body. *Id.* at 768, 856. She was recommended to counseling and prescribed birth-control pills. *Id.* at 848-49.

Vincennes Police Department Crime Scene Investigator Mark Dupire arrived at the apartment building between 6 and 7 a.m. He advised Palilonis of his rights and obtained consent to search his apartment. Palilonis said that he had drank about six or seven beers and three or four shots of Jagermeister during the night, with his last drink at around 3 a.m.

Meanwhile, Vincennes Police Department Detective Dustin Luking interviewed Devarenne at the police department about the incident. Devarenne gave a forty-five-minute recorded statement in which he told Detective Luking that he initially thought B.S. and Palilonis were engaged in consensual sexual relations when he first saw them. *Id.* at 918. Devarenne said he did not think that Palilonis was wearing a condom but that he "didn't look that close . . . as to actual [sic] which hole he penetrated." *Id.* at 920.

After talking to Devarenne, Detective Luking went to Good Samaritan Hospital to interview B.S. He then returned to the police department to interview Palilonis. Palilonis

5

signed a second waiver of his *Miranda* rights before the interview.  State's Ex. 54.

During the interview, Palilonis initially denied any sexual contact with B.S.  Detective

Luking then falsely indicated that someone other than B.S.'s friends had seen him on top

of B.S., and Palilonis admitted that he did attempt to initiate sex with her, but he thought

it was consensual given their earlier sexual encounter.  Tr. p. 1037-39.  The following

exchange took place during the interview:

> Q    Did she uh was she awake?
>
> A    Well she woke up and that is when I got off and she said no no stop.
>      So I stopped and got off and said all right I'm out of here then.
>
>            *    *    *    *    *
>
> Q    Were you trying to penetrate her?
>
> A    No when she woke up no.
>
>            *    *    *    *    *
>
> Q    So she is asleep on the couch and you though [sic] you would try to
>      have sex with her?
>
> A    Pretty much.
>
>            *    *    *    *    *
>
> Q    What made her wake up?
>
> A    I have no idea.  I would imagine me trying to stick it in her.
>
> Q    Okay.  So you actually were trying to penetrate her?
>
> A    Yes I just told you that.
>
> Q    Okay.  Did you actually touch her vagina then with her [sic] penis?
>
> A    Ish.  [sic]  I mean I got pretty close to it.
>
>            *    *    *    *    *

Q    Now listen Jason uh I know that you came out of the room.  You saw her on the couch and you saw an opportunity there.  Okay, she at no time awoke and said she wanted to have sex, did she?

A    No.

Q    Okay.  And you though [sic] uh I am going to have a chance here to have some sex.  Okay.  Right?

A    Pretty much.

*Id.* at 1039-44.  During the interview, Palilonis denied penetration and ejaculation.  *Id.* at 1044, 1046.

After the recorded interview was completed, Palilonis told Detective Luking in the hallway of the police department that he thought he might have penetrated B.S. a few times but he was going to stick to his story because he did not remember with certainty.  Palilonis also said "I hate to think I am going to prison for ten seconds of fun."  *Id.* at 1052.

Palilonis consented to accompany police to Good Samaritan Hospital to have a suspect rape kit completed that day.  The rape kit did not establish any sexual contact between Palilonis and B.S.  State's Ex. 50, 51.  After the rape kit was performed, Detective Luking arrested Palilonis.  Three days later, the State charged Palilonis with Class C felony rape in Judge Timothy Crowley's court, but it later amended the charge to Class B felony rape.  Appellant's App. p. 37, 52-53.  Approximately one year later, B.S. committed suicide.  *Id.* at 111.

Before trial, Palilonis attempted to exclude all evidence of B.S.'s death and her statements made during her sexual-assault examination.  *Id.* at 111-12.  The trial court overruled Palilonis's motion as to B.S.'s statements during her medical examination and

7

ruled that the State could present evidence that B.S. was deceased but could not reveal that she had committed suicide. Tr. p. 575-76.

Palilonis also tried to suppress the statements he made to Detective Luking, alleging that he did not knowingly consent because he was intoxicated and had recently been beaten up. At a suppression hearing, Detective Luking testified that he did not observe any signs that Palilonis was intoxicated and that he would not have interviewed Palilonis if he were intoxicated and unable to consent. *Id.* at 114, 116. Detective Luking also noted that Palilonis did not ask for any medical treatment for the beating he sustained. *Id.* at 114. The trial court denied Palilonis's motion to suppress. Appellant's App. p. 157.

Due to continuances and court congestion, the trial did not begin until May 5, 2009, nearly four years after the incident. During trial, Devarenne testified that he saw Palilonis raping B.S., Tr. p. 894 ("I saw Jason's penis go inside of her vaginally"), and Basford testified that he saw Palilonis naked on top of B.S. *Id.* at 933. Tammy Freeman, the Good Samaritan Hospital nurse who performed the sexual-assault examination on B.S., testified as to statements B.S. made to her during the examination that concerned the events of the rape. *Id.* at 851. She also made the following statements without objection from Palilonis:

Q      And [B.S.'s case] was noteworthy to you?

A      Oh absolutely.

Q      And why is that?

A      Uh. I guess the easiest way to say it is. Uh when you talk to someone and you have been around this situation enough times uh I guess you could just

8

> say it was believable. The story is believable or should I say her story is believable.
>
> Q So [B.S.] made an impression?
>
> A Absolutely.
>
> Q You said she supplied you with a history so you could do your treatment. Is that correct?
>
> A. Yes.
>
> Q Did she do that in this circumstance?
>
> A Yes she did.
>
> Q How would you describe, uh you said she made an impression on you. How would you describe her on this occasion?
>
> A She was what I would call very straight forward with me . . . .

*Id.* at 820-21. The prosecutor referred to these statements again in his closing argument but did not give his own opinion as to B.S.'s truthfulness. *Id.* at 1162.

The jury found Palilonis guilty. Appellant's App. p. 215. The jury was polled, and every juror agreed with the verdict. Tr. p. 1257-59. Four days after the verdict, however, Palilonis's counsel received an anonymous letter from a juror alleging juror misconduct. Palilonis filed a motion to set aside the verdict and asked that Judge Crowley recuse himself because he was allegedly involved in the jury misconduct. Judge Crowley denied any misconduct but recused himself; Judge Sherry Gregg Gilmore was selected as a special judge. Judge Gilmore allowed Palilonis in-camera access to the jury questionnaires, through which he was able to identify the juror who wrote the letter – Virginia Kassinger.

9

An evidentiary hearing was held, and Kassinger said her motivation for coming forward in this case was that she did not feel like Palilonis was guilty. *Id.* at 1383. She testified that the jury foreperson, Philip Stutsman, told the jury that the judge knew things that the jury did not and thought that Palilonis was guilty. *Id.* at 1352, 1361. Kassinger alleged that Stutsman learned this information through Ashlee Morris, his wife's cousin and one of two high-school students who were shadowing Judge Crowley as part of a school program during one day of the trial. Kassinger also claimed that Stutsman told the jury that Judge Crowley told the high school students at lunch that Palilonis was guilty. *Id.* at 1359. Based on Kassinger's testimony, Judge Gilmore concluded that Palilonis had established by a preponderance of the evidence that "improper contact occurred, that extraneous information was injected into the jury room, and that the information pertained to a matter pending before the jury, thereby establishing a rebuttable presumption of prejudice." Appellant's App. p. 338. The State was then allowed to present evidence in rebuttal.

A second evidentiary hearing was held at which time Judge Crowley, the two high-school students (Ashlee Morris and Mason DeLisle), Kathy Morris (Ashlee Morris's mother), and Stutsman testified and contradicted Kassinger's claims. Tr. p. 1404-1526. Judge Crowley testified that he did discuss the case with the two students, including the fact that B.S. had committed suicide, but he denied making any comments indicating that Palilonis was guilty. *Id.* at 1416-25. Both high school students denied that Judge Crowley ever made any comments about Palilonis's guilt. *Id.* at 1429, 1438. Mason testified that Judge Crowley discussed the background of the case with the students,

10

while Ashlee denied that discussion took place. *Id.* at 1429, 1441. Ashlee also testified that she did not feel that she could talk about the case outside of the courtroom so she did not share any information about the case with her parents except for the fact that Stutsman was a juror. *Id.* at 1448. Kathy testified that Ashlee "talked a lot about the opening statement" but did not discuss the details of the case. *Id.* at 1455, 1458. She also testified that both Ashlee and Tonya Gott Stutsman, Stutsman's wife, told her that Stutsman was serving on the jury for this case. *Id.* at 1460, 1464. Finally, Stutsman testified that he never spoke to Ashlee Morris or any other family member about the case; he was not even aware that Ashlee went to lunch with Judge Crowley. *Id.* at 1465-66, 1479. He also denied ever telling the jury that Judge Crowley thought Palilonis should be found guilty, *id.* at 1467, and he was unaware of how B.S. died. *Id.* at 1478

After the State's rebuttal evidence, Kassinger testified again. She testified that a bailiff had informed the jury that Judge Crowley had taken the high-school students out to lunch, and close to or during jury deliberations, Stutsman allegedly began to talk to the jury about the judge's lunch with Ashlee. *Id.* at 1490-91. She also testified that Stutsman told the jury approximately four more times that the judge told the students that Palilonis should be found guilty, *id.* at 1491-93, and if the other jurors knew how B.S. had died, they would know how to vote. *Id.* at 1498. Notably, however, she herself was not aware of B.S.'s suicide until after the trial and testified that no one ever said out loud that B.S. had killed herself. *Id.* at 1498-99.

After hearing the testimony, the trial court found that the evidence "revealed that any information discussed in the jury room during the trial of this cause came from the

11

jurors themselves, within the confines of the jury room, and did not arise from any improper communication or information" and that no undue prejudice occurred. Appellant's App. p. 345-48. The trial court therefore denied Palilonis's motion to set aside the verdict. Palilonis received a ten-year sentence, with three years suspended to probation.

Palilonis now appeals.[1]

## Discussion and Decision

Palilonis makes six arguments on appeal: (1) whether the trial court abused its discretion when it denied Palilonis's motion to correct error based on alleged juror misconduct; (2) whether the trial court abused its discretion when it allowed the jury to be informed that B.S. was unavailable because she was deceased; (3) whether the trial court abused its discretion in admitting statements made by B.S. during the course of her sexual-assault examination; (4) whether the trial court abused its discretion when it admitted the vouching statements made by the nurse who performed B.S.'s sexual-assault examination; (5) whether the trial court abused its discretion when it admitted the statements Palilonis made during his interview with law enforcement after the incident; and (6) whether the evidence is sufficient to support Palilonis's Class B felony rape conviction.

## I. Juror Misconduct

Palilonis first contends that the trial court abused its discretion in denying his motion to correct errors based on alleged juror misconduct. Specifically, he argues that

---

[1] We heard oral argument in this case on April 16, 2012, at Valparaiso University Law School. We would like to once again extend our thanks to the students, staff, faculty, and administration of the school for their hospitality, and we commend counsel for the quality of their written and oral advocacy.

12

the jury foreperson told the jurors that the judge knew things that they did not and the judge thought that Palilonis was guilty – information that he learned from his wife's cousin who shadowed the judge through a school program on one day of the trial. He also argues that jurors were aware of the extraneous prejudicial information that B.S. had committed suicide. We disagree.

We review a trial court's denial of a motion to correct errors for an abuse of discretion. *Booher v. State*, 773 N.E.2d 814, 817 (Ind. 2002). An abuse of discretion occurs when the trial court's ruling is clearly against the logic, facts, and circumstances presented. *Id.* We do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling. *Collins v. State*, 822 N.E.2d 214, 218 (Ind. Ct. App. 2005), *trans. denied*.

It is a long-established principle in Indiana jurisprudence that a jury's verdict may not be later impeached by the jurors who returned it. *See, e.g.*, *Ward v. St. Mary Med. Ctr. of Gary*, 658 N.E.2d 893, 894 (Ind. 1995); *Williams v. State*, 793 N.E.2d 1019, 1031 (Ind. 2003). The policy reasons for this are that "(1) there would be no reasonable end to litigation, (2) jurors would be harassed by both sides of litigation, and (3) an unsettled state of affairs would result." *Ward*, 658 N.E.2d at 894. This principle is also set forth in Indiana Evidence Rule 606(b), which states in relevant part:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statements occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify (1) to drug or alcohol use by a juror, (2) on the question of whether extraneous prejudicial information was improperly brought to the jury's

13

attention or (3) whether any outside influence was improperly brought to bear upon any juror.

A rebuttable presumption of prejudice will arise if jurors engage in misconduct by out-of-court communications with unauthorized persons. *Spears v. State*, 811 N.E.2d 485, 488 (Ind. Ct. App. 2004). This misconduct must be "based on proof, by a preponderance of the evidence, that the extra-judicial contact or communication actually occurred and that it pertained to a matter pending before the jury." *Butler v. State*, 622 N.E.2d 1035, 1040 (Ind. Ct. App. 1993). Once the defendant has established this, a presumption of misconduct arises and the burden shifts to the State for rebuttal. *Id.* After hearing evidence from the State, the trial court "must be convinced that a substantial possibility existed that the verdict was prejudiced by the improper material before a reversal and new trial will be granted." *Id.*

Prejudicial extraneous information "may be grounds for impeaching a verdict where there is a substantial possibility that such extrinsic material prejudiced the verdict." *Hape v. State*, 903 N.E.2d 977, 987 (Ind. Ct. App. 2009). Like out-of-court communications, the burden is initially on the defendant to prove that the material brought into the jury room was extrinsic. If that burden is met, the State must then prove that the introduction of that extrinsic material was harmless. *Id.* "Absent a 'substantial possibility that [the] . . . material prejudiced the verdict,' its introduction is harmless, and jurors may not impeach the verdict by testifying about it." *Id.* (quoting *Stephenson v. State*, 742 N.E.2d 463, 477 (Ind. 2001)).

In this case, Kassinger's motivation for coming forward was that she did not feel like Palilonis was guilty, Tr. p. 1383, which is exactly what our Supreme Court warned

would happen if jurors were allowed to impeach their verdicts. After the hearings on the matter, Judge Gilmore found that the State successfully rebutted any presumption of misconduct. Palilonis's argument on this issue is therefore essentially asking us to reweigh the evidence, which we will not do. He argues that Kassinger's version of events is more reliable than Stutsman's, saying that "Stutsman specifically testified he did not remember some of the discussions during deliberations" and "Kassinger's account was too substantial and specific to be attributed solely to a misunderstanding." Appellant's Br. p. 24, 25. He also argues that Judge Gilmore's finding that the evidence discussed in the jury room did not arise from extraneous communication or information was not consistent with the evidence. As to the extraneous information of B.S.'s suicide, Palilonis contends that the mere knowledge of her cause of death was prejudicial and invited speculation by the jury that she committed suicide as a result of the rape. However, after hearing the evidence, the special judge did not find this to be the case.

We therefore find Palilonis's argument to be a request to reweigh the evidence on this issue, which we may not do. The trial court did not abuse its discretion in denying Palilonis's motion to correct errors based on alleged juror misconduct.

## II. B.S.'s Death

Palilonis next contends that the trial court abused its discretion by allowing the jury to learn that B.S. was deceased. A trial court has broad discretion in ruling on the admission or exclusion of evidence. *Kimbrough*, 911 N.E.2d at 631. The trial court's ruling on the admissibility of evidence will be disturbed on review only upon a showing of an abuse of discretion. *Id.* An abuse of discretion occurs when the trial court's ruling

is clearly against the logic, facts, and circumstances presented. *Id.* We do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling. *Collins*, 822 N.E.2d at 218.

Our research shows that this is not a frequently litigated issue, but both parties cite *Moore v.* State, 440 N.E.2d 1092 (Ind. 1982), for support of their respective positions. Moore was on trial for rape; the victim testified at his first trial, but it ended in a mistrial. Before retrial, the victim committed suicide. *Id.* at 1093. The trial court allowed her death certificate to be admitted at the retrial to explain the use of her prior testimony, but the death certificate suggested foul play was involved – the cause of death was a gunshot wound to the chest. The victim had left a suicide note, which would have disproven the theory that Moore was somehow involved, but the trial court refused to admit the note into evidence. *Id.* Moore was found guilty, and our Supreme Court reversed his conviction. *Id.* at 1095.

In making its ruling, the Court stated:

There is no need to inform the jury of any of the factors relating to the witness' absence. The trial court erred in allowing the jury to view the death certificate. It would have erred even if it had done no more than to inform the jury the witness was unavailable because she was dead.

In the case at bar, the effect of the jury's viewing of the death certificate coupled with their awareness of the timing of the death undeniably left them free to infer appellant had arranged for, or himself committed the murder of Mrs. Davis to prevent her from testifying against him.

*Id.* at 1094.

Palilonis contends that *Moore* mandates reversal in this case because the jury was informed that B.S. was unavailable because she was dead. He further argues that by

16

admitting that information, the trial court invited speculation that B.S.'s death was linked to the rape allegations and also inflamed the emotions of the jury. Because of this, he claims that he was denied a fair trial. The State, on the other hand, argues that *Moore* holds that excluding the evidence showing that the victim's death was a suicide was the abuse of discretion, not informing the jury that the victim was dead.

However, the facts of *Moore* are distinguishable from the present case. In this case, there is no indication that Palilonis was the one who was directly responsible for B.S.'s death in the way that there was in *Moore* with a suspicious fatal gunshot wound. B.S.'s death took place four years after the rape, and there was no indication that there was suspicion of foul play. While there is dicta in *Moore* that says it would have been error "if [the trial court] had done no more than to inform the jury the witness was unavailable because she was dead," *id.*, the case was decided on the fact that it was error to allow the jury to view the death certificate. The narrow grounds of this holding show that this is a fact-specific inquiry. As such, because the facts of this case are different from *Moore*, there is a lack of relevant case law on this issue.

We therefore note our required deference to the trial court on issues of admission of evidence. We find that the trial court acted in the best interest of both parties on this issue, so this was not an abuse of discretion. Informing the jury that B.S. had committed suicide would have been prejudicial to Palilonis, and not giving the jury any information as to why B.S. was not testifying would have been prejudicial to the State. Based on the specific facts of this situation, allowing the jury to know that B.S. was dead four years after the rape was not the type of highly prejudicial information that was involved in

17

*Moore*. We therefore respect our trial court colleague's judgment that this was the fairest resolution of the issue and defer to his decision; he did not err in informing the members of the jury that B.S. was unavailable because she was dead.

### III. B.S.'s Statements

Palilonis also contends that the trial court abused its discretion and violated his Sixth Amendment right to confront witnesses against him by admitting hearsay statements B.S. made to hospital personnel about being raped during her sexual-assault examination. A trial court has broad discretion in ruling on the admission or exclusion of evidence. *Kimbrough*, 911 N.E.2d at 631. The trial court's ruling on the admissibility of evidence will be disturbed on review only upon a showing of an abuse of discretion. *Id.* An abuse of discretion occurs when the trial court's ruling is clearly against the logic, facts, and circumstances presented. *Id.* We do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling. *Collins*, 822 N.E.2d at 218.

### *A. Hearsay*

Indiana Evidence Rule 803(4) says:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness.
> *     *     *     *     *
> (4) **Statements for Purposes of Medical Diagnosis or Treatment.** Statements made by persons who are seeking medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

18

This exception is "based upon the belief that a declarant's self-interest in seeking medical treatment renders it unlikely that the declarant would mislead the medical personnel person she wants to treat her." *Miles v. State*, 777 N.E.2d 767, 771 (Ind. Ct. App. 2002). There is a two-step analysis for determining whether a statement is properly admitted under Evidence Rule 803(4): "(1) whether the declarant is motivated to provide truthful information in order to promote diagnosis and treatment; and (2) whether the content of the statement is such that an expert in the field would reasonably rely upon it in rendering diagnosis or treatment." *Nash v. State*, 754 N.E.2d 1021, 1023-24 (Ind. Ct. App. 2001), *trans. denied*.

Palilonis contends that the statements made by B.S. to Freeman, the nurse who performed the sexual-assault examination, were not for the purposes of medical diagnosis or treatment, so they therefore cannot fall under the hearsay exception to Evidence Rule 803(4). Specifically, Palilonis argues that B.S. only went to the hospital at the direction of the police, she reported no physical injury or pain, and her motive in making the statements was to comply with the investigating officers and guide in the collection of evidence. Her description of the night's events, he argues, were not pertinent information for her diagnosis and treatment. We disagree.

The statements that B.S. made to the nurse concerning the events of the rape fall squarely under Evidence Rule 803(4), as they describe the "general character of the cause or external source" of her symptoms. Palilonis contends that B.S. did not suffer any pain or physical injury and therefore was not receiving medical treatment at the hospital; with that we disagree. B.S.'s statements describing the rape that she made to Freeman were

19

made so that Freeman knew how to proceed in treating B.S. They therefore were made for the purpose of medical treatment and are admissible hearsay under Evidence Rule 803(4).

We recently decided *Perry v. State*, 956 N.E.2d 41 (Ind. Ct. App. 2011), in which we found Evidence Rule 803(4) to be applicable in the context of a sexual assault, rendering admissible the victim's statements about the events of her assault. In *Perry*, the victim arrived at an Indianapolis police station "panicked and hysterical." *Id.* at 45. She told police that she had been raped and held against her will. She was later transported to the hospital where she was examined by an emergency-room nurse. At trial, the statements the victim made to the examining nurse describing the attack were admitted into evidence. *Id.* at 48.

On appeal, we upheld the admission of the statements under Evidence Rule 803(4), including the identification of Perry as the rapist. We held that "N.D.'s statements indicating she was 'grabbed . . . around the neck' and strangled were pertinent to the diagnosis and treatment of her physical injuries." *Id.* at 50. We noted that in the case of sexual assault, the events of the assault can be highly relevant for treating the victim. *Id.* at 50. We also emphasized that in the case of sexual assault, the identity of the perpetrator is significant for the potential treatment for sexually transmitted diseases, HIV, how to discharge the patient, and any psychological counseling that may be necessary. *Id.* at 50.

While this case differs from *Perry* in the sense that B.S. did not identify Palilonis by name as her rapist, the reasoning behind our decision in *Perry* is still applicable in this

instance. B.S.'s statements describing the events of her rape were highly important for making treatment decisions for sexually transmitted diseases, HIV, and psychological counseling. For example, Freeman had to know if penetration occurred to know if B.S. was at risk for sexually transmitted diseases, HIV, or even pregnancy. Hearing B.S.'s description of the events was also important for making a determination if she was in need of psychological counseling after the rape. Without all of this information, Freeman would not have been able to properly diagnose and treat B.S.

The statements B.S. made to Freeman describing the events of the rape were therefore made in the course of medical treatment and fall under the hearsay exception in Evidence Rule 803(4).

### B. Sixth Amendment

Palilonis also contends that admitting B.S.'s out-of-court statements violates his Sixth Amendment right to confront the witnesses against him because they were testimonial statements. The Sixth Amendment's Confrontation Clause states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." This applies to statements that are deemed testimonial, unless there has been a prior opportunity to cross-examine the witness and the witness is unavailable at the time of trial. *Crawford v. Washington*, 541 U.S. 36, 68 (2004).

A statement is considered testimonial "when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822 (2006). Conversely, a statement

21

is nontestimonial when "made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Id.* In *Perry*, we set forth the formulations of the "core class of 'testimonial' statements" that had been articulated in *Crawford*: "(1) ex parte in-court testimony or its functional equivalent . . . ; (2) extrajudicial statements contained in formalized testimony materials, such as affidavits, depositions, prior testimony, or confessions; and (3) 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" *Perry*, 956 N.E.2d at 52 (quoting *Crawford*, 541 U.S. at 51-52).

We addressed the issue of testimonial statements in *Perry*, specifically in the context of statements made by the victim of a sexual assault to a nurse conducting an examination. *Id.* After conducting a review of case law from around the country, we held that the statements were nontestimonial and that the primary question to consider was "what, objectively speaking, was the primary purpose of (the nurse's) examination and (the victim's) statements incident thereto?" *Id.* at 53. Our conclusion was that the primary purpose was to "furnish and receive emergency medical and psychological care." *Id.* While we noted that the examination did have an investigative component, as any evidence obtained during the exam and the medical record itself would be forwarded to law enforcement, we found that not to be the primary purpose of the examination. As a result, the statements made by the victim to the nurse in that situation were nontestimonial.

Palilonis tries to distinguish *Perry* on the basis that the primary purpose of the examination in this case was evidence collection instead of treatment, as was the case in *Perry*. Appellant's Br. p. 37. He argues that since there was no ongoing emergency – Palilonis had already been identified to the police – and the primary purpose of the statements was to collect evidence against her attacker, they must be considered testimonial. He points to the facts that the evidence collected at the hospital was introduced at trial, there was a police officer inside B.S.'s room or outside her door almost the entire time she was at the hospital, and the nurse did not testify that she needed a description of the attack to develop a treatment plan as support for his contentions. Palilonis therefore contends that B.S.'s statements to the nurse were testimonial and therefore needed to be subjected to cross-examination before being entered into evidence. We disagree.

The primary purpose of the examination was to furnish and receive emergency medical and psychological care; B.S. had just been raped and was sent to the hospital for an evaluation. Therefore, despite the fact that the evidence was later used at trial, B.S.'s statements to Freeman were nontestimonial under *Perry*. We therefore hold that the trial court did not violate Palilonis's Sixth Amendment right to confront witnesses against him.[2]

### IV. Vouching Statements

Next, Palilonis contends that the trial court abused its discretion in admitting the vouching statements made by Freeman, the nurse who performed B.S.'s sexual-assault

---

[2] Even if B.S.'s statements were found to be testimonial and therefore erroneously admitted into evidence, this error would be harmless. The evidence indicating that Palilonis raped B.S. is overwhelming, even without the statements made by B.S.

examination.  Again, a trial court has broad discretion in ruling on the admission or exclusion of evidence.  *Kimbrough*, 911 N.E.2d at 631.  The trial court's ruling on the admissibility of evidence will be disturbed on review only upon a showing of an abuse of discretion.  *Id.*  An abuse of discretion occurs when the trial court's ruling is clearly against the logic, facts, and circumstances presented.  *Id.*  We do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling.  *Collins*, 822 N.E.2d at 218.

## A. Vouching Testimony

Vouching testimony is generally prohibited under Indiana Evidence Rule 704(b), which states: "Witnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions."  This testimony is considered to be an "invasion of the province of the jurors in determining what weight they should place upon a witness's testimony."  *Gutierrez v. State*, 961 N.E.2d 1030, 1034 (Ind. Ct. App. 2012).

Until recently, an exception was made to Evidence Rule 704(b) for vouching testimony in child-molesting cases, under the rationale that "'[t]he child's capacity to accurately describe a meeting with an adult which may involve touching, sexual stimulation, displays of affection and the like, is automatically in issue . . . .'"  *Stewart v. State*, 555 N.E.2d 121, 125 (Ind. 1990) (quoting *Lawrence v. State*, 464 N.E.2d 923, 925 (Ind. 1984)), *abrogated on other grounds by Lannan v. State*, 600 N.E.2d 1334 (Ind. 1992).  However, our Supreme Court very recently decided *Hoglund v. State*, 962 N.E.2d

24

1230 (Ind. 2012), in which it expressly eliminated this vouching testimony exception in the context of child-molesting cases.

Vouching testimony is much less prominent outside the realm of child-molesting cases, but our Supreme Court did address the issue in the context of adult witnesses in *Stewart*, 555 N.E.2d at 125. In *Stewart*, the trial court allowed a psychologist to testify as to whether, in her opinion, the testimony of a twenty-four-year-old mentally-retarded man was truthful. *Id.* The man had testified, over Stewart's objection, that Stewart had urged him to engage in oral and anal intercourse with him. *Id.* at 124. Our Supreme Court held that the trial court erred in admitting the testimony. While noting that vouching testimony at the time was allowed in cases where children were the victims of sex crimes, the Court called this "precisely the kind of vouching testimony which is prohibited, and the trial court committed reversible error by allowing its admission." *Id.* at 125.

Here, Freeman testified at trial that B.S.'s case was noteworthy to her because her statement that she was raped was believable. This is impermissible vouching testimony that should not have been admitted into evidence at trial.

### B. Fundamental Error

While the vouching testimony was improper and should not have been admitted, Palilonis did not object to the testimony at trial. Tr. p. 19-22. In order to preserve an issue for appeal, a contemporaneous objection must be made when the evidence is introduced at trial. *Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010). If no such objection is made, the issue is waived for appellate review. *See Kubsch v. State*, 784

25

N.E.2d 905, 923 (Ind. 2003) ("Failure to object at trial to the admission of evidence results in waiver of that issue on appeal."). Nevertheless, Palilonis claims the admission of this evidence constitutes fundamental error.

The fundamental error doctrine is an exception to the general rule that the failure to object at trial constitutes a procedural default precluding consideration of the issue on appeal. *Jewell v. State*, 887 N.E.2d 939, 940 n.1 (Ind. 2008). The fundamental error exception is extremely narrow and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process. *Mathews v. State*, 849 N.E.2d 578, 587 (Ind. 2006). The error claimed must either make a fair trial impossible or constitute clearly blatant violations of basic and elementary principles of due process. *Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010), *reh'g denied.* This exception is available only in egregious circumstances. *Id.*

We have previously addressed fundamental error in the context of vouching testimony with differing results. Notably, all of these cases deal with child victims and were decided before *Hoglund*. In *Kelley v. State*, 566 N.E.2d 591 (Ind. Ct. App. 1991), we found that the admission of the vouching testimony did not result in fundamental error. During Kelley's trial for child molesting, the State asked the child victim's therapist whether she believed the child was telling the truth, to which the therapist responded, "Yes, I do." *Id.* at 593. Kelley neither objected to nor moved to strike the testimony. *Id.* On appeal, however, he claimed fundamental error. However, there was only one statement made by the therapist, and there was evidence that Kelley had sexual

intercourse with the child between fifteen to eighteen times. *Id.* at 592. In determining that it was not fundamental error to admit the therapist's opinion into evidence, we noted that the testimony did "not rise to the level where it would affect the fairness or integrity of the judicial proceedings or deny Kelley due process." *Id.* at 593.

Similarly, in *Okuly v. State*, 574 N.E.2d 315 (Ind. Ct. App. 1991), we also found vouching testimony not to rise to the level of fundamental error. Okuly was on trial for child molesting, and one of the State's witnesses was an AFDC (Aid to Families with Dependent Children – today known as Temporary Assistance for Needy Families) caseworker formerly assigned to the child victim's case. When asked whether in her opinion the child was telling the truth, the caseworker replied, "In all the conversations I've had with (the child) and all the information I've asked her or confronted her with, ah, I believe that what she is telling me and she's telling the jury and the people in this courtroom is the truth." *Id.* at 316. Okuly did not object, but he asserted fundamental error on appeal. We found no fundamental error, however, finding that after reviewing the record in its entirety that the testimony was "not so prejudicial to Okuly as to deny him a fair trial." *Id.* We also said that while the child's credibility was improperly bolstered, Okuly was not denied the chance to attack her credibility, and he had a fair opportunity to meet the allegations against him. As a result, he was not denied fundamental due process and there was no fundamental error. *Id.* at 317.

However, we did find that vouching testimony rose to the level of fundamental error in *Gutierrez*, 961 N.E.2d at 1035. During Gutierrez's trial for child molesting, the State asked the child victim's DCS case manager whether she believed the child was

27

telling the truth about the molestation – she responded, "absolutely." *Id.* at 1033. The deputy prosecutor then contemporaneously inserted his own opinion as to the truthfulness of the witness. *Id.* at 1035. It was only when the DCS case manager was asked if she could explain why she believed the child that Gutierrez's counsel objected, so we analyzed the admission of the testimony under fundamental error on appeal. *Id.* at 1033.

Unlike *Kelley* and *Okuly*, however, we found that this was fundamental error. Notably, the evidence against Gutierrez was also much less substantial than in *Kelley* and *Okuly*, as the child victim repeatedly contradicted herself in her testimony, and there was no physical evidence of sexual abuse. *Id.* We held that the testimony from the DCS caseworker was "an invasion of the province of the jurors in determining what weight they should place upon a witness's testimony." *Id.* at 1034. We also found that the prosecutor's comments about believing the child victim during his closing argument compounded the problem. *Id.* at 1035. As a result, the admission of the vouching testimony was determined to be fundamental error.

Palilonis contends that the admission of Freeman's testimony rises to the level of fundamental error. He claims that because the testimony invaded the province of the jury and the prosecutor referred to it later in his closing argument, enhancing its prejudicial impact, its admission rose to the level of fundamental error. He argues that this "constituted a substantial, blatant violation of basic principles of due process rendering the trial unfair" and prevented him from receiving a fair trial and an impartial jury. Appellant's Br. p. 43. With this, we disagree.

We find the admission of Freeman's statement to be harmless error rather than fundamental error. The prosecutor did not vouch for B.S.'s credibility himself, Tr. p. 1162; s*ee Gutierrez*, 961 N.E.2d at 1033, and Freeman's vouching testimony dealt with information that was already in evidence from other witnesses' testimony – the fact that Palilonis raped B.S. Since there were two witnesses to the rape, Devarenne and Basford, medical evidence that supported their testimony, and Palilonis's interview with the police all in evidence, Freeman's vouching testimony, while it was improper, was harmless.

### V. Palilonis's Statements

Palilonis also contends that the trial court abused its discretion in admitting the statements he made during his interview with law enforcement on the night of the incident. He argues that he did not knowingly, voluntarily, and intelligently waive his Fifth Amendment right against self-incrimination or voluntarily give statements to the police because he was intoxicated, had recently been beaten, and was subjected to deceptive police tactics. We disagree.

A trial court has broad discretion in ruling on the admission or exclusion of evidence. *Kimbrough*, 911 N.E.2d at 631. The trial court's ruling on the admissibility of evidence will be disturbed on review only upon a showing of an abuse of discretion. *Id.* An abuse of discretion occurs when the trial court's ruling is clearly against the logic, facts, and circumstances presented. *Id.* We do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling. *Collins*, 822 N.E.2d at 218.

29

The Fifth Amendment of the United States Constitution provides a privilege against self-incrimination during custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 461 (1966). A person is entitled to *Miranda* protection only when he is subjected to custodial interrogation. *Kelley v. State*, 825 N.E.2d 420, 427 (Ind. Ct. App. 2005). Custodial interrogation is "'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *Id.* (quoting *Zook v. State*, 513 N.E.2d 1217, 1220 (Ind. 1987)). It is undisputed by the parties that Palilonis was subjected to custodial interrogation by Detective Luking.

"A waiver of one's *Miranda* rights occurs when a defendant, after being advised of those rights and acknowledging an understanding of them, proceeds to make a statement without taking advantage of those rights." *Crain v. State*, 736 N.E.2d 1223, 1230 (Ind. 2000). The State has the burden to prove beyond a reasonable doubt that the waiver was made knowingly and voluntarily. *Horan v. State*, 682 N.E.2d 502, 509 (Ind. 1997).

To be admissible, a suspect's confession must also be voluntarily given. *Carter v. State*, 686 N.E.2d 1254, 1258 (Ind. 1997). A confession is voluntary if it is the product of a rational intellect and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will. *A.A. v. State*, 706 N.E.2d 259, 262 (Ind. Ct. App. 1999). Under the United States Constitution, the State must prove by a preponderance of the evidence that the defendant's confession was voluntary. *Clark v. State*, 808 N.E.2d 1183, 1191 (Ind. 2004). Under the Indiana

Constitution, when the defendant challenges the admissibility of a confession, the State must show voluntariness beyond a reasonable doubt. *Id.* The voluntariness of a defendant's confession is determined from the totality of the circumstances. *Washington v. State*, 808 N.E.2d 617, 622 (Ind. 2004).

### A. Intoxication

Our courts have consistently held that statements are not inadmissible per se when a suspect is intoxicated; they are only inadmissible because of intoxication when the suspect is so intoxicated that he is unaware of what he is saying or the intoxication has produced a state of mania in the suspect. *See, e.g.*, *Wilkes v. State*, 917 N.E.2d 675, 680 (Ind. 2009); *Luckhart v. State*, 736 N.E.2d 227, 231 (Ind. 2000). Intoxication of a lesser degree goes only to the weight to be given to the statement, not to its admissibility. *Wilkes*, 917 N.E.2d at 680.

Our courts have dealt with this issue in multiple cases. For example, in *Luckhart*, 736 N.E.2d at 231, Luckhart claimed that her confession was involuntary because she was under the influence of crack cocaine at the time of her interrogation. Our Supreme Court upheld the admissibility of her confession on appeal, noting that the interrogating officer testified at trial that during the interrogation, Luckhart "did not exhibit any signs of drug or alcohol use, was oriented as to time and place, answered questions in a logical sequence, and was able to walk without assistance." *Id.* As a result, Luckhart's intoxication was not so severe that her confession was involuntary. *Id.*

We also addressed this issue in the 2009 case of *Bean v. State*, 913 N.E.2d 243 (Ind. Ct. App. 2009). Bean argued on appeal that his custodial statements while being

interrogated for murder were not voluntary because "he was 'suffering the after effects [sic] and shock of Heather Norris' violent death and his action in disposing of her body'" and because he was under the influence of alcohol and Xanax. *Id.* at 249. Specifically, he had consumed "four to six shots of [Jagermesiter] and three to four pills of Xanax about an hour before he talked to the detectives." *Id.* (quotations omitted). Despite this, we upheld the admission of his custodial statements, holding that Bean had provided no evidence that he was not conscious of what he was doing during his interrogation or that he was in a state of mania. *Id.* at 249-50. After reviewing the totality of the circumstances, we determined that Bean's statements to the police were voluntary and any argument about his intoxication should go to the weight given to the statements and not their admissibility. *Id.*

Finally, our Supreme Court took up this issue in *Wilkes*, 917 N.E.2d at 675. Wilkes was being interrogated about his involvement in three murders and claimed five different times to be under the influence of drugs. *Id.* at 680. However, our Supreme Court ruled that the interview was not involuntary due to intoxication, noting that Wilkes did "not claim that his intoxication caused him to be unaware of his statements during the interview, and the detectives who interrogated him testified that he did not appear intoxicated." *Id.*

Palilonis argues that he could not have knowingly, voluntarily, and intelligently waived his Fifth Amendment right, despite his signed waiver, because he was suffering the effects of a recent beating and could still have been intoxicated. He points out that he had been drinking heavily up until 3 a.m. and Detective Luking neither asked him if he

32

was intoxicated nor administered any test to determine if he was still under the influence of alcohol. Appellant's Br. p. 51. Palilonis also argues that he was still suffering from the recent effects of having been beaten up, which also affected his ability to voluntarily consent to the interview. We disagree.

Palilonis had not consumed alcohol for seven hours before his interview. Detective Luking testified at trial that Palilonis showed no signs of being intoxicated during the interview and he would not have interviewed Palilonis if he believed Palilonis was intoxicated and unable to consent. Tr. p. 116. Palilonis waived his *Miranda* rights at two different times, voluntarily consenting to the interview. State's Ex. 3, 54. Finally, as for the beating that Palilonis endured, Palilonis had only superficial scratches and bruises, did not suffer any head trauma that would have affected his decision making, and never asked for medical treatment. *See* State's Ex. 36-46. We therefore find that Palilonis's statements were not inadmissible due to the beating he endured or intoxication.

### B. Deceptive Police Tactics

Palilonis also argues that Detective Luking engaged in deceptive police tactics by claiming that a "totally independent" person who did not know B.S. saw Palilonis raping her, when in fact, the only witness he had at that point was Devarenne.

While deceptive police interrogation tactics "weigh heavily against the voluntariness of the defendant's confession," *Henry v. State*, 738 N.E.2d 663, 665 (Ind. 2000), they do not automatically render a confession inadmissible, *Clark v. State*, 808 N.E.2d 1183, 1191 (Ind. 2004). The conduct of the police must be examined in the

33

context of the "totality of the circumstances" test to determine if it overbore the suspect's will, rendering the statement involuntary. *Henry*, 738 N.E.2d at 665.

We addressed this issue specifically in the context of false representations as to the statements made by others in the 1980 case of *Ward v. State*, 408 N.E.2d 140 (Ind. Ct. App. 1980). Ward was arrested and interrogated about a burglary to which he eventually confessed. During Ward's interrogation, police officers falsely stated that his accomplice had made a statement that incriminated him. *Id.* at 143. On appeal, Ward argued that his confession was a result of the deceptive statement made by the police officer and that the statement "induced him to give a confession that was not freely self determined." *Id.* We, however, found that the trial court did not err in finding that the officer's statement was permissible. We noted that simply confronting a suspect with incriminating evidence does not amount to coercion and "even where the officer falsely tells the defendant that his accomplice has incriminated him, the deceptive statement is insufficient to render the confession inadmissible." *Id.*

Also, in *Light v. State*, 547 N.E.2d 1073, 1078-79 (Ind. 1989), the police officer who interrogated Light testified to lying to Light during the interrogation about having a letter that never actually existed; this statement caused the defendant to confess. In finding that Light's confession was voluntary, our Supreme Court stressed the importance of the totality-of-the-circumstances test and the need to focus on the entire investigation instead of just a single act of the police. *Id.* at 1079. Although Light was of lower intelligence and the police lied to him, the Court held that this was not sufficient evidence to find that Light's will was overcome, rendering his confession involuntary.

34

In *Henry*, 738 N.E.2d at 664, the Court cited *Light* and its use of the totality-of-the-circumstances test. Henry was informed during his interrogation that his fingerprints were found at the crime scene and that someone had identified him as the killer, neither of which was true. *Id.* In upholding the admission of Henry's statement into evidence, the Court noted that it had "upheld the trial court's admission of a defendant's statement into evidence on facts more egregious than those presented here." *Id.* (citing *Light*, 547 N.E.2d at 1079). The Court also declined Henry's invitation to depart from the totality-of-the-circumstances test and create a bright-line rule for deceptive police tactics. *Id.*

After reviewing this case under the appropriate totality-of-the-circumstances test, we find that the police, while misleading Palilonis in one particular act, did not conduct a coercive or deceptive interrogation. Palilonis knew that there were witnesses to the rape, and the police altering the identity of one of the witnesses was not so egregious that the false statement overrode Palilonis's free will. Palilonis's statements were therefore voluntarily made, and the trial court did not abuse its discretion in admitting those statements into evidence.

### VI. Sufficiency of the Evidence

Our standard of review with regard to sufficiency claims is well settled. In reviewing a sufficiency-of-the-evidence claim, this Court does not reweigh the evidence or judge the credibility of the witnesses. *Bond v. State*, 925 N.E.2d 773, 781 (Ind. Ct. App. 2010), *reh'g denied*, *trans. denied*. We consider only the evidence most favorable to the verdict and the reasonable inferences drawn therefrom and affirm if the evidence and those inferences constitute substantial evidence of probative value to support the

verdict. *Id.* Reversal is appropriate only when a reasonable trier of fact would not be able to form inferences as to each material element of the offense. *Id.*

Palilonis was convicted of Class B felony rape, which is governed by Indiana Code section 35-42-4-1 and provides in relevant part:

> (a) Except as provided in subsection (b), a person who knowingly or intentionally has sexual intercourse with a member of the opposite sex when: . . .
> (2) the other person is unaware that the sexual intercourse is occurring . . .
> commits rape, a Class B felony.

Palilonis contends that there is insufficient evidence of penetration, intent, B.S.'s unawareness, and lack of consent.

The evidence adduced at trial shows that Palilonis penetrated B.S. and that he had the intent to do so. Devarenne explicitly testified that he saw Palilonis penetrating B.S. Tr. p. 894 ("I saw Jason's penis go inside of her vaginally."). The nurse who performed B.S.'s sexual-assault examination also testified that B.S. told her that Palilonis penetrated her. *Id.* at 851 ("I told him to get off of me, he had vaginal sex with me."). Finally, Detective Luking's interview with Palilonis after the incident was admitted into evidence, during which Detective Luking asked Palilonis what he was trying to do when he was with B.S. that night. Palilonis responded, "[h]ave sex with her." *Id.* at 1037. Later in the interview, Detective Luking asked, "Okay. So you actually were trying to penetrate her then?" to which Palilonis replied, "Yes I just told you that." *Id.* at 1043.

It was also clear that B.S. was unaware that sexual intercourse was occurring and therefore could not have consented to it. During the interview, the following exchange took place between Detective Luking and Palilonis:

36

Q    Okay, she at no time awoke and said she wanted to have sex, did she?

A    No.

*Id.* at 1044.  Palilonis himself admitted that B.S. was asleep and did not consent to sex.

This evidence is sufficient to support Palilonis's conviction for Class B felony rape.

Affirmed.

MATHIAS, J., and BARNES, J., concur.