## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 25 2017, 10:23 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Valerie K. Boots
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jesse R. Drum
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

William Gholston,

*Appellant-Defendant*,

v.

State of Indiana,

*Appellee-Plaintiff*.

September 25, 2017

Court of Appeals Case No.
49A05-1605-CR-1031

Appeal from the Marion Superior Court

The Honorable Marc Rothenberg, Judge

Trial Court Cause No.
49G02-1411-MR-52305

**Brown, Judge.**

[1] William Gholston appeals his conviction for murder.[1] He raises two issues which we revise and restate as:

I.  Whether the trial court abused its discretion in admitting the videotape of his interview with the police; and

II.  Whether the evidence is sufficient to sustain his conviction.

We affirm.

### Facts and Procedural History

[2] In 2013, Gholston met Nicole Cruz in a west-side Indianapolis neighborhood and told her that he lived in the neighborhood on North Traub Avenue. At the time, he lived nearby at 1133 North Elder Avenue. Gholston and Cruz entered into a relationship, and he moved in with her. After their relationship ended in July 2014, Cruz moved to Bluffton, Indiana.

[3] In the summer of 2014, Gholston met Victor Robinson who lived in the west-side neighborhood at 1025 North Traub Avenue. Gholston did not move in with Robinson, but he used his address. During that time, Gholston also lived at 1057 North Traub Avenue.

[4] On August 29, 2014, Gholston withdrew money using his debit card from an ATM at the Phillips 66 gas station located in the west-side neighborhood at the

---

[1] Ind. Code § 35-42-1-1 (2014).

corner of 16th Street and North Tremont Street. The next day, he made a purchase using his debit card at a liquor store located nearby at 16th Street and Medford Avenue.

[5] On the weekend of August 29-31, 2014, fifteen-year-old Dominique Allen was staying at her older sister Mareeka's house located in the same west-side neighborhood near 14th Street and Mount Street. On Saturday evening, August 30, 2014, Dominique and a girlfriend went to the downtown mall, met up with another girlfriend, and eventually returned to the neighborhood where Mareeka lived at around 11:00 pm. Throughout the rest of the evening and early hours of Sunday morning, the girls met with various friends and walked around the near west side. At some point, Dominique and one of her girlfriends became upset with each other because Dominique would not help her friend look for the friend's lost cell phone.

[6] The three girls eventually returned to Mareeka's house around 4:00 a.m. on Sunday morning, and Dominique's two girlfriends went to bed. Dominique placed her cell phone on a charger and then went outside and sat in front of the house.

[7] Also on Saturday night, Shannon Baxter was staying at his girlfriend's house that was located across the street from Mareeka's house. He had seen Dominique and other teenagers sitting on Mareeka's front porch earlier in the evening. Around 4:00 a.m. on Sunday morning, there was a shooting at the Phillips 66 gas station near Mareeka's house. When Baxter and his girlfriend

heard police sirens coming from the station, they walked toward the gas station to see what was happening, and Baxter saw Dominique walking alone toward the gas station.

[8] When Baxter returned home, he saw Dominique sitting alone in front of Mareeka's house and was concerned. He asked Dominique if she was "all right," and whether she "need[ed] to use the phone or something." Transcript Volume I at 141. Dominique said she was "okay," and Baxter went inside his girlfriend's house and went to sleep. *Id*.

[9] Mareeka woke up at 8:00 a.m. on Sunday morning, August 31, 2014. Dominique's friends were in the house, but Dominique was not. Mareeka searched the neighborhood for Dominique but was unable to find her. Mareeka called the police to report Dominique missing.

[10] At around 8:00 a.m. on August 31st, Katherine Perry walked outside her home at 1054 North Elder Avenue and saw a fire at a neighboring house. She could not see what was burning but assumed a neighbor was burning trash. Also around 8:00 a.m., Willie Hawkins, who lived at 1101 North Elder Avenue, saw smoke coming from the back of a house located across the street from him at 1108 North Elder Avenue.

[11] Bradley Parks lived at 1108 North Elder Avenue and had lived there for approximately three months. Before Parks moved in, the house had been uninhabited for years. On the morning of the 31st, Parks took his dog outside to

his backyard and there discovered Dominique's burned, dead body, and he called 911.

[12] All of Dominique's body was burned, some parts more severely than others. In places, the flesh had been burned so badly that Dominique's bone was exposed. A plastic bag had been placed over her head and had melted onto it. Looped and knotted around her neck was a ligature – a black coaxial cable – that also was tied to her ankles. Forensic trace chemistry testing showed an odorless charcoal lighter fluid likely had been used to burn the body. The autopsy results showed the cause of death was asphyxiation by either manual or ligature strangulation or by suffocation and that death had occurred before the body was burned. The pathologist found bruising of the left eye and of the lips and abrasions of the neck.

[13] On September 2, 2014, Dominique's purse and the pair of black sandals she had been wearing when she disappeared were found in the backyard of an unoccupied house located at 1919 West 10th Street. They appeared to have been neatly placed on the ground. The purse was opened but appeared to be undisturbed. The items were found a little over a block south of the house where Dominique's body had been found two days earlier.

[14] On September 2nd, Gholston withdrew additional money from the ATM at the Phillips 66 gas station. Two days later, he called Cruz and asked her to pick him up from Indianapolis. She took him back to Bluffton, Indiana, and he moved in with her.

[15]     In early November 2014, the police received DNA results from Dominique's body and belongings. The results showed the likely presence of Gholston's DNA on Dominique's left hand and right foot and the presence of his DNA on her right sandal.

[16]     The police arrested Gholston in Bluffton for a parole violation and transported him to Indianapolis. On November 10, 2014, he was placed in an Indianapolis Metropolitan Police Department ("IMPD") interview room, and IMPD Captain Craig Converse and Detective Marcus Kennedy (hereinafter collectively referred to as "the officers") entered, eventually *Mirandized* Gholston, and began speaking with him. He spoke to the officers at length before invoking his right to remain silent and right to counsel. The entire interview was videotaped. That same day, a warrant was obtained for a buccal swab from Gholston for the purpose of DNA comparison, and a sample was collected.

[17]     On November 20, 2014, the State charged Gholston with murder, and on January 29, 2015, it alleged that he was an habitual offender.

[18]     Before trial, on January 12, 2016, Gholston moved to suppress all the statements he provided to the officers during the videotaped interview, alleging that the statements were obtained in violation of his Fifth and Sixth Amendment rights to remain silent and to counsel and in violation of his corresponding rights under the Indiana Constitution, Article One, Sections 13 and 14. He argued alternatively that any statements made after he invoked his

*Miranda* rights should be suppressed. A hearing was held on February 16, 2016[2] and on February 22, 2016, the trial court issued an order granting the motion in part and denying it in part, and excluding the statements Gholston made to the officers prior to his being advised of his rights.

[19] On March 7-9, 2016, Gholston was tried by jury. A redacted version of his videotaped interview that excluded his pre-*Miranda* statements was played for the jury. The jury found him guilty as charged. On April 15, 2016, the court found Gholston to be an habitual offender and sentenced him to sixty-four years imprisonment, enhanced by twenty years for the habitual offender finding, for a total sentence of eighty-four years.

## Discussion

### I. Admission of Videotaped Interview

[20] Gholston raises several issues regarding whether the trial court abused its discretion when it admitted into evidence his videotaped interview with the officers. His specific arguments are that the waiver of his *Miranda* rights was not voluntary, the officers continued to question him after he invoked his *Miranda* rights, and a *Doyle* violation occurred.

---

[2] A complete video recording of Gholston's interview with the officers was admitted into evidence at the suppression hearing, and the evidence admitted at the suppression hearing was incorporated into the record at trial.

[21] A trial court has broad discretion in ruling on the admission or exclusion of evidence. *Palilonis v. State*, 970 N.E.2d 713, 731 (Ind. Ct. App. 2012), *trans. denied*. The trial court's ruling on the admissibility of evidence will be disturbed on review only upon a showing of an abuse of discretion. *Id*. An abuse of discretion occurs when the trial court's ruling is clearly against the logic, facts, and circumstances presented. *Id*. We do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling. *Id*. at 731-732.

[22] When Gholston was interviewed by Captain Converse and Detective Kennedy, Captain Converse removed the restraint from Gholston's arm and offered refreshments. The officers said they were investigating a missing girl, showed Gholston a sketch of a man they said was a possible suspect as well as a picture of Dominique, and asked Gholston if he could help with the investigation. The officers did not tell him initially that his DNA had been found at the scene of the crime or that he was a suspect. They told him they were reading him his *Miranda* rights because of the parole violation. Captain Converse thanked Gholston for helping the officers with the investigation, for "treatin' us [officers] man to man and helpin'."[3] State's Exhibit 6 at 25.

[23] Detective Kennedy read Gholston his *Miranda* rights as follows:

---

[3] This part of the videotaped interview took place prior to Gholston being read his rights. It was found by the trial court to be inadmissible and was not seen by the jury. The part of the interview that took place after Gholston was read his rights was found by the trial court to be admissible and was played to the jury.

[I]t says you have the right to remain silent. Anything you say can be used as evidence against you in court. Well, and we ain't even talking about that right now. You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning. And if you decided to answer questions now without a lawyer, you still have the right to stop at any time. You also have the right to –

State's Exhibit 183 at 1. Gholston interrupted and asked, "Do I need a lawyer?" *Id*. The following exchange then took place:

[Detective Kennedy]: No, we're just showin' you pictures and stuff.

[Gholston]: Oh.

[Detective Kennedy]: You also have the right to stop answering questions any time until you talk to a lawyer. Understand those?

[Gholston]: Now, you read number two and said not at this time. What's that supposed to mean?

[Captain Converse]: Oh, that means-- . . . --that means if you wanted a lawyer, you know--

[Gholston]: No.

[Captain Converse]: --you don't have to talk to us.

[Gholston]: No, it says anything I can--anything I say can be used as evidence against me in court. [Detective Kennedy] said, "We ain't talkin' about that right now."

[Captain Converse]: Well--no, no, like if I showed you this picture--

[Detective Kennedy]: Yeah.

[Gholston]: Oh.

[Captain Converse]: --William, if I showed you this picture and you said, "Oh, yeah, by the way, I was with him and we hit a lick together.", [sic] then we would be obligated by law when we were filing charges with this guy and say, "We talked to William, William was with him."

[Gholston]: Oh.

[Captain Converse]: So that's what I meant. If you tell us you're--you were with one of these guys, we'd obligated [sic] to report it.

*Id*. Gholston then read the Advice of Rights form and signed the Waiver of Rights. As Gholston signed the waiver, Detective Kennedy again told him, "you can stop [talking to us] at any time." *Id*. at 3.

[24] Gholston proceeded to tell the officers that he left the west-side neighborhood on August 1, 2014, and returned at the beginning of September to help his mother pay a bill. He said he had seen Dominique only on the news. When the officers confronted him with the fact that they had found his DNA at the scene, he cursed then said, "you got me sweatin' now, man." *Id*. at 24. When Captain Converse pointed out that his DNA being found at the scene contradicted his story about leaving town for a month, Gholston said, "I'm

done talkin'. . . . Yeah, yeah I'm done talkin'. And I asked you all if I needed an attorney, [sic] you all said, 'No'." *Id.* at 25-26. At that point, the officers stopped asking questions and then told Gholston they were going to obtain a search warrant to take a sample of his DNA.

[25] Despite telling the officers he was "done talkin'," Gholston began asking the officers questions, and the following exchange took place:

> [Gholston]: And on there it says--what--a handprint? Can I read that again, please?
>
> [Captain Converse]: No. No. Not right now. You said you wanted--you said you didn't wanna talk anymore.
>
> [Gholston]: Yeah. Yeah.
>
> [Captain Converse]: So, you know, you--
>
> [Gholston]: That said a handprint on it--
>
> [Captain Converse]: --you indicated you were done.
>
> [Gholston]: --or somethin'.
>
> [Detective Kennedy]: But, yeah, we do have your DNA on several places at the scene.
>
> [Gholston]: Where was she killed at? That's what I--
>
> [Captain Converse]: Well--

[Gholston]:  --(inaudible) I mean--

[Captain Converse]:  --you--

[Gholston]:  --you're not sayin'--

[Captain Converse]:  --listen, you told us you don't wanna talk anymore and you mentioned a lawyer.  We can't talk to you, I mean--

[Gholston]:  He's still talkin'.  He's still talkin' about--

[Detective Kennedy]:  Mm-hmm.

[Gholston]:  --where they found some stuff at at the scene.  What scene?  Where was she killed at?

[Detective Kennedy]:  Well, we found her body on Elder. 10th-- or 11th and Elder.

[Gholston]:  Mm-hmm.

[Detective Kennedy]:  Which is the next street over from Traub.

[Gholston]:  Uh-huh.

[Detective Kennedy]:  We believe she was killed at 10th and Elder.

[Gholston]:  So, who lives on 10th and Elder?

[Detective Kennedy]:  Nobody.  Well, without--askin' any questions or anything--

[Gholston]:  Mm.

[Detective Kennedy]:  --I can tell you that you--your DNA was found --.

*Id.* at 27-28.

Captain Converse re-cuffed Gholston to his comfort and asked if he wanted more water.  Gholston continued to ask questions as the officers reiterated that they found his DNA at the scene and told Gholston that he was "the only one of interest in this case."  *Id.* at 29-30.  Gholston then asked for an attorney to be present when the DNA sample was taken.  The following exchange occurred.

> [Gholston]:  But now on this--hold on now.  On this test thing, though, I'm not sayin' no but could I at least have an attorney present?  Please?  Before we do this? . . .  I would like one here for that, well, I mean, seriously.  Please.  I mean, I'm not denyin' nothin'.  I'm not denyin' that I'm gonna--submit the thing, you know what I mean?  So, you know, I don't-- . . .  I mean--at least--can I at least try to find me an attorney, though?  Because I don't--trust this man, seriously.

> * * * * *

> [Captain Converse]:  If you wanna initiate something, you know, we can do that and talk (inaudible).  You know, we can't talk anymore right--to you right now because, I mean, 'cause you've already said you didn't wanna talk, you want a lawyer and all that, I, you know.

* * * * *

> [Gholston]: Yes, I do. . . . I would like to have an attorney present, though before we do anything, please.

*Id*. at 31-32. The officers discussed whether Gholston had a right to have an attorney present when the DNA sample was taken but did not ask Gholston any additional questions about the case. Captain Converse again asked Gholston if the officers could get him more refreshments and then the officers left the interview room.

### A. Waiver of Miranda Rights

[27] Gholston's first contention regarding the admission of the videotaped interview is that the trial court abused its discretion by admitting the interview because he did not voluntarily and intelligently waive his right to remain silent. According to Gholston, the officers used deception and trickery to convince him to waive his *Miranda* rights.

[28] The State bears the burden of proving beyond a reasonable doubt that the defendant voluntarily and intelligently waived his rights. *Ringo v. State*, 736 N.E.2d 1209, 1211 (Ind. 2000). A waiver of one's *Miranda* rights occurs when the defendant, after being advised of those rights and acknowledging an understanding of them, chooses to make a statement without taking advantage of those rights. *Id*. at 1211-1212. The voluntariness of a defendant's waiver of rights is judged by considering the totality of the circumstances. *Id*. at 1212. Factors that may be considered when reviewing the totality of the

circumstances for whether a waiver of rights was voluntary, include "police coercion, the length of the interrogation, its location, its continuity, as well as the defendant's maturity, education, physical condition, and mental health." *State v. Keller,* 845 N.E.2d 154, 165 (Ind. Ct. App. 2006). "A signed waiver form is one item of evidence showing the accused was aware of and understood his rights." *Ringo*, 736 N.E.2d at 1212. Nevertheless, "[w]hen challenged, the State may need to show additional evidence tending to prove that Defendant's waiver and decision to speak were voluntary." *Id*.

[29] Gholston points to the following as evidence that the officers used deception and trickery to convince him to waive his *Miranda* rights: the officers did not tell him at the beginning of the interview that his DNA had been found on Dominique's body and sandal; the officers repeatedly told him that the only reason he was being interviewed was because he had been arrested for a parole violation; the officers "repeatedly minimized and misrepresented the basis for advising [him] of his rights and the significance of [his rights];" the officers led him to believe that they "were required to read him his rights only as a formality . . . because he had been arrested for a parole violation;" and the police led him into a false sense of security by offering him refreshments and shaking his hand. Appellant's Brief at 15, 18. We are not persuaded.

[30] During the interview, Detective Kennedy, while pointing to the Advice of Rights form, read aloud to Gholston each *Miranda* right. When the detective used the phrase "and we ain't even talking about that right now," Gholston asked for clarification. State's Exhibit 183 at 1. The officers explained that, if

during the interview Gholston told them he participated in criminal activity, the officers would be obligated to report it. Gholston gave no indication that he did not understand the explanation, and he signed the waiver and proceeded to talk with the officers. He later demonstrated his awareness of his rights when he requested that the interview stop because he wanted to talk to an attorney.

[31] The officers did not lie to Gholston when they told him that he had been brought to the police station because of a parole violation and that his DNA was found at the crime scene. Their decision not to tell Gholston initially that he was a suspect in Dominique's murder and that his DNA was found at the scene of the crime was not deception or trickery prohibited by *Miranda*. *See Colorado v. Spring*, 479 U.S. 564, 576-577, 107 S. Ct. 851, 858-859 (1987) ("This Court has never held that mere silence by law enforcement officials as to the subject matter of an interrogation is 'trickery' sufficient to invalidate a suspect's waiver of *Miranda* rights . . . . '[W]e have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.'") (footnotes and internal citations omitted). "[A] suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." *Id*. at 577, 107 S. Ct. at 859.

[32] Gholston is not uneducated: he is a high school graduate, and at the time of the interview was forty-six years old. He was cogent and lucid during the interview. There was no evidence of threats, violence, promises, or use of

improper influences by the officers. The entire interview lasted approximately ninety minutes.

[33] Gholston was familiar with the criminal justice system and with waiving his *Miranda* rights due to his connection with crimes that occurred more than a decade ago. He was investigated for murder by the Indianapolis Police Department ("IPD") in 2002 and 2003. At that time, he was advised of his rights, and he signed a waiver of rights form and provided a detective with a statement that was used against him at his murder trial.[4] In 2004, he was investigated for sexual assault charges and was interviewed by an IPD detective who read him his *Miranda* rights. In that case, he initially requested an attorney and told the detective:

> [Gholston]: I will not [sign the waiver of rights form] until [my attorney is] here because I just been through this and I've been tricked once before with this stuff there. . . . I don't wanna do anything until my attorney gets here. I don't wanna do anything. . . . I mean, I wanna know what's goin' on before I . . . I say anything. Cause I don't know what the hell is goin' on. And if this is some stuff that's above my head . . . stuff I don't understand, I'd rather have somebody here that can clarify, you know, for me . . . break it down for me. Because I'm not understanding this at all. I'm not understanding this at all.

> [Detective Burkhardt]: Okay. That says to me that you want your attorney present.

---

[4] Following the trial, Gholston was found not guilty of the murder charge.

[Gholston]:  Yes.

State's Exhibit 3 at 2-3.  Gholston later decided to waive his rights and give a statement to the detective.[5]

[34]  We do not find that any trickery, deception, or other circumstances occurred during Gholston's interview that would overcome the voluntariness of the waiver of his rights.  We find beyond a reasonable doubt that Gholston voluntarily waived his rights and conclude that the trial court did not abuse its discretion in admitting the videotaped interview based upon Gholston's contention that the waiver of his rights was involuntary.

### B. Right to Counsel

[35]  Gholston next contends that the trial court erred in admitting into evidence his videotaped interview because the officers continued to interrogate him after he unambiguously and unequivocally invoked his right to counsel by saying, "I'm done talkin'."  State's Exhibit 183 at 25.  He maintains that he told the officers "he no longer wanted to talk to them at least six times before [Captain] Converse [stopped asking him questions]."  Appellant's Brief at 22.

[36]  Pursuant to *Miranda,* any person subject to a custodial interrogation has the right to counsel.  *Sauerheber v. State*, 698 N.E.2d 796, 801 (Ind. 1998).  When a defendant has invoked this right to counsel, the police must cease questioning

---

[5] The State eventually dismissed the sexual assault charges because the alleged victim did not cooperate.

until counsel has been made available or until the accused initiates further communication with the police. *Id*. The request for counsel, however, must be unambiguous and unequivocal. *Carr v. State*, 934 N.E.2d 1096, 1102 (Ind. 2010). "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," the interrogation need not cease. *Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350 (1994).

[37] When the officers told Gholston that his DNA was found at the crime scene, he told them that he returned to Indianapolis from Bluffton, Indiana, in September. He then cursed and said, "you got me sweatin' now, man. After further discussion, the following exchange occurred:

> [Gholston]: --I'm done talkin'.
>
> [Detective Kennedy]: (Inaudible).
>
> [Captain Converse]: I mean, here's the thing, if--
>
> [Gholston]: No--
>
> [Captain Converse]: --if you--
>
> [Gholston]: --I'm done.
>
> [Captain Converse]: --if you wanna talk about somebody else.

[Gholston]:  No.

[Captain Converse]:  Not you but if there's somebody else--

[Gholston]:  No.

[Captain Converse]:  --we need to know about--

[Gholston]:  No, I'm done talkin' 'cause this here's a trickery [s***].  I'm done talkin'.

[Detective Kennedy]:  No, we're not tryin' to trick you.

[Gholston]:  Yeah, yeah I'm done talkin'.  And I asked you all if I needed an attorney, you all said, "No."

[Captain Converse]:  Okay.

State's Exhibit 183 at 25-26.  After Gholston said he was "done talkin'," the officers did not ask him any more questions.  Instead, they told him they were going to obtain a warrant to take a sample of his DNA.  He then began asking the officers questions about where Dominique's body was found.  The officers answered his questions, explained that his DNA was found at the scene of the crime, and told him he was the only suspect in the case.  They reminded him that he told them he did not want to talk with them.

[38]  Gholston was equivocal when he expressed that he no longer wanted to talk with the officers.  He did not unambiguously assert his right to counsel when he said, "I'm done talkin'" such that the officers were required to terminate the

interview because after he said, "I'm done talkin'," he continued to ask the officers questions even after the officers reminded him that he told them he no longer desired to speak with them. Although Gholston continued to speak with the officers, the officers treated him as if he unequivocally had invoked his *Miranda* rights and did not ask him additional questions. Based upon the foregoing, the trial court did not abuse its discretion in admitting the videotaped interview on that basis.

### *C. Doyle Violation*

[39] Gholston also argues that the admission of the interview amounted to a *Doyle* violation because "[it] permitted the State to use Gholston's assertion [during the interview] of his right to stop talking with police as affirmative proof of his guilt." Appellant's Brief at 9, 24. Per Gholston:

> The prosecution purposely showed the jury that once confronted with the DNA evidence and his seemingly inconsistent statements, Gholston chose that moment to invoke his right to stop talking to police. This was an obvious attempt to suggest that Gholston's assertion of his constitutional right showed he was guilty, and knew he had been caught. . . . [By showing the videotape,] the State aimed to imply to the jurors that Gholston was not willing to submit to the [buccal] swab without counsel present because he had something to hide.

Appellant's Reply Brief at 11. Gholston also argues that the prosecutor violated *Doyle* when he said during closing arguments, "[Gholston] was told by the detectives that his DNA was on that body and he didn't have any explanation." Transcript Volume IV at 789.

[40]     In *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S. Ct. 2240, 2245 (1976), the United States Supreme Court held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment." The Court explained, "while it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings." *Id*. at 618, 96 S. Ct. at 2245. In this context, "'[s]ilence' does not mean only muteness; it includes the statement of a desire to remain silent as well as a desire to remain silent until an attorney has been consulted." *Kubsch v. State*, 784 N.E.2d 905, 914 (Ind. 2003). The *Doyle* rule is not limited solely to the use for impeachment purposes of a defendant's silence, as it has been held to apply to the use of a defendant's silence as affirmative proof in the State's case-in-chief. *Id*.

[41]     As for the prosecutor's comment during closing arguments that Gholston had no explanation regarding his DNA being found at the scene of the crime, this did not amount to a *Doyle* violation. The prosecutor's statement was not used to impeach Gholston and was not a comment on Gholston's right to remain silent. To the extent Gholston argues a *Doyle* violation occurred when the State played the portion of the videotaped interview showing him invoking his right to remain silent, we note that he failed to object to the admission of the videotaped interview on grounds that it constituted an impermissible comment on his right to remain silent. When the State offered the videotaped interview at trial, defense counsel objected "based on our previous Motion to Suppress . .

. and move to incorporate our arguments from our [memorandum in support of the Motion to Suppress]." Transcript Volume III at 698-699. However, the motion to suppress did not raise allegations of a *Doyle* violation, and when defense counsel objected at trial to the admission of the interview, counsel did not allege that a *Doyle* violation had occurred. A claim of trial court error in admitting evidence may not be presented on appeal unless there is a timely trial objection "stat[ing] the specific ground [of objection], unless it was apparent from the context." Ind. Evidence Rule 103(a)(1); *see, e.g., Hilliard v. State*, 609 N.E.2d 1167, 1169 (Ind. Ct. App. 1993) (by failing to object, defendant waived issue that prosecutor made improper comment in closing rebuttal argument about defendant's silence). Gholston's failure to object on the specific ground of a *Doyle* violation waives the issue.

[42] Further, even assuming a *Doyle* violation occurred, Gholston must demonstrate fundamental error. A claim that has been waived by a defendant's failure to object at trial may be reviewed on appeal to determine whether fundamental error occurred, but the fundamental error exception to the contemporaneous objection requirement is "extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." *Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010) (quoting *Mathews v. State,* 849 N.E.2d 578, 587 (Ind. 2006)). To be considered fundamental, the claimed error must make a fair trial impossible. *Id*. (citing *Clark v. State,* 915 N.E.2d 126, 131 (Ind. 2009)). Thus, this exception is available only in

"egregious circumstances." *Id*. (citing *Brown v. State,* 799 N.E.2d 1064, 1068 (Ind. 2003)).

[43] To determine whether a *Doyle* violation denied a defendant a fair trial, we must examine five factors: (1) the use to which the prosecution puts the post-arrest silence; (2) who elected to pursue the line of questioning; (3) the quantum of other evidence indicative of guilt; (4) the intensity and frequency of the reference; and (5) the availability to the trial court judge of an opportunity to grant a motion for mistrial or to give curative instructions. *Robinette v. State,* 741 N.E.2d 1162, 1165 (Ind. 2001); *see, e.g., Barton v. State*, 936 N.E.2d 842 (Ind. Ct. App. 2010) (applying *Robinette* factors in assessing whether fundamental error occurred), *trans. denied*.

[44] In *Kubsch*, the Indiana Supreme Court addressed whether the trial court erred in admitting into evidence Wayne Kubsch's entire videotaped interrogation. Kubsch was charged with three counts of murder. The videotaped interrogation showed two rounds of Kubsch's questioning by the police, during which Kubsch invoked his right to remain silent. At trial, and over Kubsch's objection, the State played the entire videotape twice to the jury. Kubsch was convicted as charged. On appeal, the Court found that there was a *Doyle* violation and that the trial court erred in admitting into evidence the entire videotape. *Kubsch*, 784 N.E.2d at 914. The Court then examined the five factors to determine whether the error was harmless beyond a reasonable doubt (as a proper objection had been made) and found that it was not because:

> The use to which the State, in its case in chief, put those portions of the videotape showing Kubsch invoking his right to silence is rather apparent: Kubsch was unwilling to talk with police even though his wife and step-son had just been killed, giving the impression that Kubsch had something to hide or else he would assist in locating their killers. And although the amount of other evidence indicative of Kubsch's guilt as set forth in the "Facts" section of this opinion is sufficient to sustain the convictions, that evidence is circumstantial and was fiercely contested at trial.

*Kubsch*, 784 N.E.2d at 915 (footnote omitted). At Kubsch's trial, the prosecution made numerous references to Kubsch's invocation of his right to silence. The defense requested a curing instruction, but the instruction was not given. The Indiana Supreme Court also found particularly relevant that it appeared the jury reached its verdict shortly after watching the videotape for a second time. *Id*. at 916.

[45] We now turn to the instant case. Regarding the factor of the prosecution's use of Gholston's post-*Miranda* silence, we note that the prosecution played the portion of the videotaped interview for the jury during which Gholston invoked his right to remain silent, which could have allowed the jury an opportunity to draw the impermissible inference that by invoking his silence he had something to hide.[6] However, when we apply the remaining factors to determine whether

---

[6] We observe the jury was instructed that Gholston was not required to "explain anything" at trial. Preliminary Instructions 7 and 2 – Confidential Appendix III at 51, 61.

Gholston was denied a fair trial, we find that Gholston's case can be distinguished from *Kubsch*.

[46] The factor of the quantum of other evidence indicative of Gholston's guilt, though circumstantial, favors a finding Gholston received a fair trial. During the summer of 2014, Gholston lived approximately one block from where Dominique's body was found. He told the officers that he left the west-side neighborhood on the first of August and did not return until September; however, evidence showed that on August 29, 2014, two days before Dominique was murdered, he withdrew money from an ATM located in the west-side neighborhood and, on the following day, he made a purchase at a nearby liquor store. Gholston claimed he did not know Dominique but his DNA likely was found on her body and was found on her sandal which was located a little over a block away from where her body was found. When the officers presented Gholston with the DNA evidence, he told them "you got me sweatin' now, man," then proceeded to repeatedly gesture as if to wipe sweat from his forehead. State's Exhibits 182, 183 at 24. Gholston's neighbor remembered seeing Gholston in the neighborhood prior to the date that Dominique was murdered but not after, and Gholston moved to Bluffton a few days after Dominique's body was discovered.

[47] In addition, the reference to Gholston's silence was minimal and favors a finding that he received a fair trial. The prosecution played the video one time for the jury and did not elicit any testimony from witnesses regarding Gholston invoking his right to silence. Also, there was no opportunity for the trial court

to admonish the jury, grant a motion for mistrial, or give a curative instruction because no objection on grounds of a *Doyle* violation was made, and this factor also favors the conclusion he received a fair trial.

[48] Based upon the record, and in light of the five factors, we find that any *Doyle* violation was not so substantial and blatant as to render Gholston's trial unfair and did not constitute fundamental error.

## *II. Sufficiency of the Evidence*

[49] Gholston next contends that there is insufficient evidence to support his murder conviction because the evidence presented at trial was circumstantial.

> Our standard of review for claims challenging the sufficiency of the evidence is well settled. Whether the evidence is direct or circumstantial, we will not reweigh it or assess the credibility of witnesses. Reviewing solely the evidence and the reasonable inferences from that evidence that support the verdict, we decide whether there is substantial evidence of probative value from which a reasonable jury could find the defendant guilty beyond a reasonable doubt. A conviction for [m]urder may be based purely on circumstantial evidence. We will not disturb a verdict if the jury could reasonably infer that the defendant is guilty beyond a reasonable doubt from the circumstantial evidence presented. On appeal, the circumstantial evidence need not overcome every reasonable hypothesis of innocence. It is enough if an inference reasonably tending to support the verdict can be drawn from the circumstantial evidence.

*Moore v. State*, 652 N.E.2d 53, 55 (Ind. 1995) (internal citations omitted). To support Gholston's murder conviction, the State was required to prove that

Gholston "knowingly or intentionally kill[ed] another human being. . . ." Ind. Code § 35-42-1-1 (2014).

[50] The evidence at trial shows that Gholston was very familiar with the west-side neighborhood where the crime took place. During the summers of 2013 and 2014, he resided in the neighborhood. In the summer of 2014, he met a woman who lived in the neighborhood and began living with her. The woman's house was located on the same block where Dominique's body was found. During that same summer, Gholston also lived in a house that was located approximately one block from where the body was found.

[51] When Gholston was interviewed by the officers about Dominique's murder, he lied to the officers. He told them that he left the west-side neighborhood the first of August 2014, and did not return until September 2014; however, bank records showed that on August 29, 2014, he withdrew money from an ATM located at a gas station in the west-side neighborhood and that, on the following day, he made a purchase at a nearby liquor store.

[52] Dominique was visiting her sister from August 29-31, 2014, and was last seen alive in the early morning hours, on Sunday, August 31st, sitting in front of her sister's house. The house was located in the west-side neighborhood where Gholston was staying and was approximately one block from the gas station that housed the ATM that he had recently used. Dominique's burned, dead body was discovered around noon on August 31st, behind a house that had been uninhabited for years but recently had become occupied, and was located

approximately one block from a house where Gholston used to live. Gholston's neighbor remembered seeing him in the neighborhood prior to the date that Dominique was murdered but not after.

[53] On September 2ⁿᵈ, Dominique's purse and the pair of black sandals she had been wearing when she disappeared were found in the backyard of an unoccupied house located a little over a block south of the house where her body was found. That same day Gholston withdrew more money from the ATM located at the neighborhood gas station. Two days later, on September 4, 2014, Gholston called his ex-girlfriend and asked her to pick him up from Indianapolis. She took him back to Bluffton where she lived, and he moved in with her.

[54] During his interview with the officers, Gholston claimed he did not know Dominique; however, DNA results showed the likely presence of his DNA on Dominique's left hand and right foot and the presence of his DNA on her right sandal, which was found a little over a block away from where her body was found. When the officers told Gholston that his DNA had been found at the crime scene, he told them, "you got me sweatin' now, man," then proceeded to gesture as if to wipe sweat from his forehead. State's Exhibits 182, 183 at 24.

[55] Although no single fact proves that Gholston murdered Dominique, we find that the collective circumstantial evidence was sufficient to allow a reasonable jury to infer that Gholston killed her. Considering these facts together, the jury

could have found beyond a reasonable doubt that Gholston killed Dominique. Thus, sufficient evidence supports his murder conviction.

## *Conclusion*

[56] Although it was erroneous to admit into evidence the parts of Gholston's videotaped interview with Captain Converse and Detective Kennedy that showed him invoking his right to silence, we find that the error did not result in fundamental error. We also find that the State presented sufficient evidence to support Gholston's murder conviction.

[57] For the foregoing reasons, we affirm the judgment of the trial court.

[58] Affirmed.

Vaidik, C.J., concurs in result without opinion.

Bradford, J., concurs.