## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 20 2017, 10:18 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kyle E. Cray
Bennett Boehning & Clary, LLP
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Henry A. Flores, Jr.
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

Jeffrey Leonard Camp,

*Appellant-Defendant*,

v.

State of Indiana,

*Appellee-Plaintiff*.

December 20, 2017

Court of Appeals Case No.
79A02-1707-CR-1676

Appeal from the Tippecanoe
Superior Court

The Honorable Sean M. Persin,
Judge

Trial Court Cause No.
79D05-1611-F6-1008

**Brown, Judge.**

[1] Jeffrey Leonard Camp appeals his conviction and sentence for residential entry as a level 6 felony. Camp raises three issues which we revise and restate as:

I. Whether the trial court abused its discretion in admitting certain evidence;

II. Whether the evidence is sufficient to sustain his conviction; and

III. Whether his sentence is inappropriate in light of the nature of the offense and his character.

We affirm.

## Facts and Procedural History

[2] At approximately midnight on October 7, 2016, Camp went to the residence of Julie Camp. The two had been divorced for approximately six years and had two children together who lived with Julie. Camp and Julie had attempted to reconcile but he had not lived at her residence since April of 2016. M.C., who was Camp and Julie's sixteen-year-old daughter, heard tapping on the window of the front door of the house and went to the door, moved the curtain over the window to the side, and observed Camp. Julie was not home and was with a friend at a going away party. M.C., who was babysitting her younger brother and the child of Julie's friend, knew that she was not allowed to let Camp in the house, was really scared, and ran to her phone to tell her mother that Camp was at the house. Because Julie's phone did not have cellular service, M.C. used a messaging application to send messages to Julie's friend. The messages

stated "PLEASE HELP MY DAD IS HERE" and "PLEASE HELP PLEASE HELP." The time-stamp on the screenshot showing these messages displays 11:53 p.m. State's Exhibit 3.

[3] M.C. went back to the living room "because [she] heard [Camp] at the door like he was still there" and "checked if he was still there and he was in our house." Transcript Volume 2 at 66. Camp asked where Julie was and why M.C was using her phone. M.C. replied "to text mom because he wasn't supposed to be there," Camp told M.C. "[t]urn your phone off," and she did so. *Id.* at 67-68. Camp asked in a raised voice why M.C. was home by herself, and M.C. was scared. Camp left the house, and M.C. immediately locked the door, turned her phone on, and sent follow-up messages to Julie's friend. The messages stated "he left," "[h]e made me shut my phone off," and "[h]e just appeared at the door and came in and I'm shaking." State's Exhibit 4. Julie arrived home soon afterwards and called the police, and Julie and M.C. spoke to the responding police officer.

[4] Camp sent numerous messages to Julie following the incident. Julie sent Camp a message asking "[w]hy are you coming to the house late at night?!?!" State's Exhibit 5 at 1. Camp replied: "To catch you in your bullshit. Mission accomplished." *Id.* Camp sent numerous other messages to Julie throughout the rest of the night and the next day. State's Exhibit 5 contains approximately seventy-four pages of messages he sent beginning at 11:47 p.m. The exhibit shows that Julie sent several text messages to Camp at approximately 12:01 a.m. stating that she was not home and M.C. was babysitting and telling him to

leave. She also sent messages at 12:24 a.m. stating that he had no right to go inside the house. The remainder of the numerous and lengthy barrage of messages were sent by Camp to Julie from 12:04 a.m. through 4:48 a.m. and then again from 11:50 a.m. through 2:30 p.m. with additional messages sent after that time. *See* State's Exhibit 5 at 1-74.

[5] On November 7, 2016, the State charged Camp with residential entry as a level 6 felony. On January 9, 2017, prior to trial, Camp went to the prosecutor's office and indicated he was there to give a statement hoping to clear things up. He was advised of his right to an attorney, that anything he said could be used against him, and that there were not any promises made to him, and he provided his version of events to Maria Hancock, an investigator for the prosecutor's office, and the deputy prosecutor. Camp did not have an appointment and was not represented by counsel at the time. He disclosed that he had gone inside Julie's house and also stated that M.C. had "giggl[ed] [sic] the door handle and it opened." Transcript Volume 2 at 118.

[6] On May 2, 2017, Camp filed a motion in limine requesting in part that the court exclude from evidence conversations that took place between the State and Camp regarding the resolution of the case. In ruling on Camp's motion, the court stated that the request "remain[ed] under advisement until trial to see whether a proper foundation/waiver exist." Appellant's Appendix Volume 2 at 52.

[7]     During the trial, the jury heard testimony from M.C., Julie, Investigator Hancock, and Camp. M.C. testified that the door was locked. When asked how she knew it was locked, she answered "[b]ecause we are supposed to check it, it's part of our safety plan." Transcript Volume 2 at 59. When asked if she ever had to unlock the door for anything, M.C. answered "[o]nly when my mom tells me to if it's her" and "[t]o let our cats inside or outside." *Id.* at 59-60. M.C. indicated that she, her brother, and her mother were allowed to unlock the door to let the cats in and out, that she did not unlock the door that night to let the cats out, and that she did not know if her younger brother did so. She testified that Camp did not live at the house and did not have a key to the house and that she was not allowed to let him in. When asked what happened after she sent the messages to Julie's friend, she responded: "I went back to the living room because I heard dad at the door like he was still there and I checked if he was still there and he was in our house." *Id.* at 66. When asked if the door was unlocked, M.C. replied "[n]o, not that I know of" and again indicated that she did not know if her younger brother had unlocked the door. *Id.* When asked if she opened the door for Camp, M.C. answered "[n]o." *Id.* at 67. When asked how she felt while Camp was present, she testified she "was really scared." *Id.* at 68. When asked how long Camp talked to her, M.C. answered "[m]aybe thirty minutes, I don't know exactly," and when asked "[b]ut minutes at least," she answered "[y]es." *Id.*

[8]     On cross-examination, M.C. indicated that she and Julie had an understanding that Camp was not to come into the house. When asked who would have

unlocked the front door, M.C. replied probably her younger brother but she did not know for sure. When asked if the front door was difficult to open, M.C. replied affirmatively and stated that her brother could open it but that it took him a minute. When asked if she told Camp to leave or if there was any conversation, M.C. replied "I couldn't get any words to come out." *Id.* at 72. She indicated that Camp had told her to open the back door but that she went to her phone. When asked "why didn't you just lock the door," M.C. replied "[b]ecause I thought it was locked, I didn't know if anyone unlocked it." *Id.* at 73. When asked about her testimony about the length of time she talked to Camp, she answered that "[i]t felt like thirty minutes, I'm not quite sure." *Id.* at 74. When asked if she recalled a conversation with her mother after the police arrived during which Julie told her not to allow Camp to come into the house, M.C. answered affirmatively. When asked, "if it were already the case that you knew and your mom made it clear that he wasn't supposed to be there, why was it necessary for her to tell you at that point that he's not to be in the house," M.C. replied "[s]he's just reiterating so we don't forget." *Id.* at 75. On redirect examination, M.C. indicated that she had been told and reminded more than once before that Camp could not come inside, that to her knowledge Camp did not have a key, that Camp did not have permission to enter the house, and that she did not open the door for him.

[9] Julie testified that the door was locked when she left her house, that her children would unlock the door to let their cats outside and were supposed to lock the door again, and that her children have previously forgotten to lock the

door. She testified that Camp did not have permission to enter her house that night, she went home immediately after learning he was present, M.C. was extremely upset when she arrived home, and she called the police. She stated that Camp admitted in text messages to going inside the house, and that he was not on the lease, did not have a key, and did not have permission to enter the house. On cross-examination, Julie indicated that the police interviewed everyone who was present at the same time and that she reiterated to M.C. in front of the officer that Camp was not allowed in the house and nothing had changed. Upon questioning by the court, Julie answered she was sure Camp did not have a key, and when asked if he could have kept one without her knowledge, she responded affirmatively.

[10] When the State indicated that it intended to call Investigator Hancock as a witness, the court heard testimony from Investigator Hancock outside the presence of the jury regarding her recollection of the January 9, 2017 meeting and Camp's statements at the meeting. Investigator Hancock informed the court that she and the deputy prosecutor met with Camp, that Camp was given warnings about his right to counsel and that anything he said could be used against him, that a plea agreement was not discussed, that the meeting was completely unexpected, and that no promises were made regarding the outcome of the case. Investigator Hancock stated that Camp was told that his statement would not necessarily have an impact on his case. Camp's defense counsel objected to Investigator Hancock's testimony and argued "she hasn't been named as witness" and "[s]o one of my concerns is I guess not meeting that

foundation requirement providing you know the notes that she needs to refresh her recollection and then with the statements (inaudible) helpful and then she doesn't remember that well either." *Id.* at 108. The court permitted Investigator Hancock to testify before the jury regarding Camp's statements at the prosecutor's office, and she testified that Camp had stated at the meeting that he had gone into Julie's house. When asked if Camp had said how he entered the house, she answered "[h]e said that he had come to the door that [M.C.] was on the other side" and "[w]hat I recall is that he mentioned her giggling [sic] the door handle and it opened." *Id*. at 118.

[11] Camp testified that he went to Julie's house and knocked on the door, M.C. pulled the curtain back from over the window, he noticed over M.C.'s shoulder that there was a small child who was passed out on the couch, at that point he was merely concerned about what he saw, and that he began asking M.C. to open the door. He testified that M.C. "fiddled with the door for a few moments" and "said she couldn't get it open." *Id.* at 137. He stated that he instructed M.C. to let him in the back door, that he went to the back door but M.C. never arrived, and that he went back to the front door and knocked again. He stated that M.C. pulled the curtain aside, began to try to open the door again, and said it was stuck. He testified that he said "[M.C.], I need you to open the door" and that "through the fidgeting of the door, she did open the door." *Id.* at 138. Camp testified that he stepped inside the house and was there for approximately eight to ten minutes, that he was trying to speak to M.C. and asked why she had not contacted him, that M.C. "was texting during

this time so I asked her to put it down so that she could pay attention to me," and that M.C. did so. *Id.* at 139.

[12] The jury found Camp guilty of residential entry as a level 6 felony. At sentencing, the trial court found that his criminal history, pretrial release violation, and disdain for authority were aggravating circumstances, that his military service was a mitigating circumstance, that the aggravators outweighed the mitigator, and sentenced Camp to 730 days with 365 days to be executed and 365 days on Tippecanoe County Community Corrections at a level to be determined.

## *Discussion*

### I.

[13] The first issue is whether the trial court abused its discretion in admitting Camp's statements at the January 9, 2017 meeting at the prosecutor's office. A trial court has broad discretion in ruling on the admission or exclusion of evidence. *Palilonis v. State*, 970 N.E.2d 713, 731 (Ind. Ct. App. 2012), *trans. denied*. The trial court's ruling on the admissibility of evidence will be disturbed on review only upon a showing of an abuse of discretion. *Id.* An abuse of discretion occurs when the trial court's ruling is clearly against the logic, facts, and circumstances presented. *Id.* We do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling. *Id.* at 731-732. We will not reverse an error in the admission of evidence if the error was harmless. *Turner v. State*, 953 N.E.2d 1039, 1058 (Ind. 2011). Errors in the

admission of evidence are generally to be disregarded unless they affect the defendant's substantial rights. *Id.* at 1059. In viewing the effect of the evidentiary ruling on a defendant's substantial rights, we look to the probable effect on the fact finder. *Id.* The improper admission is harmless error if the conviction is supported by substantial independent evidence of guilt satisfying the reviewing court that there is no substantial likelihood the challenged evidence contributed to the conviction. *Id.* The erroneous admission of evidence which is cumulative of other evidence admitted without objection does not constitute reversible error. *Hoglund v. State*, 962 N.E.2d 1230, 1240 (Ind. 2012) (citation omitted), *reh'd denied*.

[14] Camp asserts that his statements at the January 9, 2017 meeting were inadmissible statements made in connection with plea negotiations and that the court erred in admitting them. He argues that the deputy prosecutor present at the meeting had authority to enter into a plea agreement with him, that he was unrepresented at the time, and the fact he was speaking about the case with the prosecutor at all demonstrates his purpose of alleviating the potential consequences of his charges. He also argues he sufficiently preserved his argument for appeal.

[15] The State contends that Camp waived his argument on appeal because it is different than the argument he raised at trial. The State further maintains that Camp's statements were not part of any plea negotiations, that he arrived at the prosecutor's office to "clear things up" and was advised of his right to counsel, and that his statements could be used against him, and that there were no

promises made, and that the statements were nothing more than unilateral assertions on Camp's part. Appellee's Brief 17 (citing Transcript Volume 2 at 118). The State also argues that any error in the admission of the statements was harmless as they were not prejudicial to the defense, that in fact they bolstered Camp's credibility as his trial testimony mirrored his statements to the investigator, and that the statements were merely cumulative of his own testimony.

[16] Statements and admissions made by a defendant during plea negotiations are generally inadmissible at a subsequent trial in the matter. *See Gonzalez v. State*, 929 N.E.2d 699, 701-702 (Ind. 2010); Ind. Evidence Rule 410. To constitute plea negotiations, however, the following criteria must be present: (1) the defendant must have been charged with a crime at the time of the statement; (2) the statement must have been made to someone with authority to enter into a binding plea bargain; and (3) the parties must have agreed to negotiate. *Gonzalez*, 929 N.E.2d at 701-702.

[17] While Camp had been charged at the time of his statements and made his statements to both Investigator Hancock and the deputy prosecutor, the record does not establish that there was an agreement to negotiate. After Camp arrived unannounced and without representation at the prosecutor's office, he was advised of his right to counsel and that anything he said could be used against him. No promises were made to Camp, he was told that his statement would not necessarily have an impact on his case, and a plea agreement was not discussed. Camps' statements constitute unilateral assertions on his part

and not plea negotiations. *See Martin v. State*, 537 N.E.2d 491, 493 (Ind. 1989) ("A unilateral offer of evidence to induce a party to negotiate is not protected.") (citing *Chase v. State*, 528 N.E.2d 784, 786 (Ind. 1988)).

[18] Further, the evidence of Camp's statements at the January 9, 2017 meeting was cumulative of his testimony before the jury. At both the January 9, 2017 meeting and in his trial testimony, Camp stated that he entered Julie's residence but that M.C. had opened the door. Any error in admitting the statements of Camp at the January 9, 2017 meeting was harmless.

## II.

[19] The next issue is whether the evidence is sufficient to sustain Camp's conviction. When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Jordan v. State*, 656 N.E.2d 816, 817 (Ind. 1995), *reh'g denied.* We look to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* The conviction will be affirmed if there exists evidence of probative value from which a reasonable jury could find the defendant guilty beyond a reasonable doubt. *Id.*

[20] Camp argues that M.C.'s testimony is incredibly dubious and cannot support his guilty verdict and that she was the sole testifying witness to his alleged criminal actions. He argues "[s]pecifically, whether [he] turned the door knob and opened the door or whether M.C. opened the door for him[,] M.C.'s testimony regarding whether or not the door was locked, the length of time [he] was in the residence, and the conduct of [Julie] during the police interview

together demonstrates the incredible dubiosity of M.C.'s testimony." Appellant's Brief 10. He also argues there is a lack of circumstantial evidence he used force to enter the residence. The State responds that M.C.'s testimony was not incredibly dubious, M.C. was unequivocal that it was Camp who opened the door, it is irrelevant how much time Camp spent in the house, whether the door was locked is immaterial, and Camp's argument urges this court to reweigh the evidence and M.C.'s credibility.

[21] Ind. Code § 35-43-2-1.5 provides that a person who knowingly or intentionally breaks and enters the dwelling of another person commits residential entry as a level 6 felony. A person engages in conduct "intentionally" if, when he engages in the conduct, it is his conscious objective to do so, and a person engages in conduct "knowingly" if, when he engages in the conduct, he is aware of a high probability that he is doing so. Ind. Code § 35-41-2-2. In order to establish that a breaking has occurred, the State need only introduce evidence from which the trier of fact could reasonably infer that the slightest force was used to gain unauthorized entry. *McKinney v. State*, 653 N.E.2d 115, 117 (Ind. Ct. App. 1995). The opening of an unlocked door is sufficient. *Id.* "Lack of consent is not an element of the offense the State is required to prove." *Id.* at 118. "Rather, it is the defendant who must claim and prove the defense of consent." *Id.* "A defendant's belief that he has permission to enter must be reasonable in order for the defendant to avail himself of the defense of consent." *Id.*

[22] We observe that the uncorroborated testimony of one witness is sufficient to sustain a conviction. *Ferrell v. State*, 565 N.E.2d 1070, 1072-1073 (Ind. 1991).

To the extent Camp asserts that the incredible dubiosity rule requires reversal of his conviction, we note that the rule applies only in very narrow circumstances. *See Love v. State*, 761 N.E.2d 806, 810 (Ind. 2002). The rule is expressed as follows:

> If a sole witness presents inherently improbable testimony and there is a complete lack of circumstantial evidence, a defendant's conviction may be reversed. This is appropriate only where the court has confronted inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity. Application of this rule is rare and the standard to be applied is whether the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it.

*Id.*

[23] Camp fails to show that the testimony of M.C. was inherently contradictory. To the extent her testimony conflicted with Camp's testimony, this is an issue of witness credibility. Also, the jury heard testimony regarding when M.C. and her brother were permitted to unlock the door, M.C.'s recollection as to whether the door was locked, M.C.'s actions after Camp knocked on the door including her testimony that she did not unlock or open the door, the length of time Camp was inside the house, and the statements of Julie to police and M.C. after the incident, and the witnesses were thoroughly examined and cross-examined. The function of weighing witness credibility lies with the trier of fact, not this Court. *Whited v. State*, 645 N.E.2d 1138, 1141 (Ind. Ct. App. 1995). Further, we cannot say that M.C.'s testimony was so inherently improbable that no reasonable person could believe it. The jury also heard

testimony that Camp had not lived at the residence for months, was not on the lease, and to the knowledge of Julie and M.C. did not have a key. Camp does not show how the testimony against him was somehow internally inconsistent and has not shown M.C.'s testimony to be incredibly dubious.

[24] Based upon our review of the evidence and testimony most favorable to the conviction as set forth in the record and above, we conclude that sufficient evidence exists from which the jury as the trier of fact could find Camp guilty beyond a reasonable doubt of residential entry as a level 6 felony.

III.

[25] The next issue is whether Camp's sentence is inappropriate in light of the nature of the offense and his character. Ind. Appellate Rule 7(B) provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Under this rule, the burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

[26] Camp argues that his offense was committed in a less egregious way than a typical level 6 felony for residential entry, that he had lived at the residence only six months prior, that at worst he turned a door knob and walked through an unlocked door, and that he did not attempt to enter without the occupant's knowledge or damage any property to enter the residence. He argues that he had been employed for nearly two years and letters from his co-workers

affirmed his good character and that his military record speaks highly of his character. He also argues that the remoteness of his two prior convictions should be taken into account and that the violations of pre-trial release involved the use of marijuana and did not threaten the safety or welfare of the public or victims in this case. The State responds that Camp has not shown that his sentence is inappropriate, that his actions were selfish and completely disregarded any emotional distress they may have caused his sixteen-year-old daughter who was frightened and pleaded for help when he showed up unannounced at midnight, and that his prior convictions for domestic battery and invasion of privacy and his violation of pre-trial release by using marijuana multiple times also support his sentence.

[27] Ind. Code § 35-50-2-7 provides that a person who commits a level 6 felony shall be imprisoned for a fixed term of between six months and two and one-half years with the advisory sentence being one year. The court found that Camp's criminal history, pretrial release violation, and disdain for authority were aggravating circumstances, that his military service was a mitigating circumstance, and that the aggravators outweighed the mitigator. It sentenced him to 730 days with 365 days to be served on community corrections.

[28] Our review of the nature of the offense reveals that Camp showed up unannounced at Julie's residence around midnight, instructed M.C. to open the door, entered the residence without Julie present and without permission, asked M.C. about Julie's location, and told M.C. to turn off her phone. M.C. was frightened and sent messages to Julie's friend asking for help. Camp sent a

barrage of aggressive messages to Julie over the course of hours through that night and the following day.

[29] Our review of the character of the offender reveals that Camp was honorably discharged from the United States Army, that he has had the same employment for nearly two years, and that several of his co-workers submitted letters to the court positively describing his character. He was convicted of domestic battery against Julie as a felony in 2007 for which he received 545 days with 180 days on community corrections, and of invasion of privacy as a misdemeanor against Julie in 2010. He also violated his pretrial release conditions by testing positive for marijuana more than once.

[30] After due consideration, we conclude that Camp has not sustained his burden of establishing that his sentence is inappropriate in light of the nature of the offense and his character.

## *Conclusion*

[31] For the foregoing reasons, we affirm Camp's conviction and sentence for residential entry as a level 6 felony.

[32] Affirmed.

Baker, J., and Riley, J., concur.