## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 28 2020, 10:56 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Stephen Gerald Gray
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jamal R. Smith, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | January 28, 2020 <br><br> Court of Appeals Case No. 19A-CR-881 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Alicia Gooden, Judge <br><br> The Honorable Richard Hagenmaier, Magistrate <br><br> Trial Court Cause No. 49G21-1710-F2-42053 |

**Vaidik, Judge.**

# Case Summary

[1] Jamal R. Smith appeals his convictions and sentence for Level 2 felony dealing in a narcotic drug and Class B misdemeanor possession of marijuana. Specifically, Smith contends that (1) the trial court erred by admitting evidence from searches he claims violated the Fourth Amendment to the United States Constitution, (2) the trial court erred by admitting a recording of his on-scene interview in violation of the Fifth Amendment to the United States Constitution, (3) the trial court erred in finding him to be a habitual offender when he did not personally waive his right to a jury trial for the habitual-offender charge, and (4) his sentence is inappropriate in light of the nature of the offenses and his character. We affirm the convictions but reverse the trial court's habitual-offender finding and the twenty-year enhancement imposed as a result and remand this case to the trial court for further proceedings.

# Facts and Procedural History

[2] In 2010, Smith was convicted of Class B felony dealing in cocaine and sentenced to ten years executed in the Department of Correction. In March 2017, the trial court modified Smith's sentence so that he would be released on parole. As part of his parole, Smith agreed to abide by several conditions, including that he would obtain written permission from his parole officer before changing his residence, that he would not possess controlled substances, and that he would not engage in conduct prohibited by federal or state law or local ordinance. *See* Suppression Hr'g Ex. 1. Smith also agreed

that my person and residence or property under my control may be subject to reasonable search by my supervising officer or authorized official of the Department of Correction if the officer or official has reasonable cause to believe that the parolee is violating or is in imminent danger of violating a condition to remaining on parole.

*Id.*

[3] Initially, Smith requested to live at a house on White Avenue in Indianapolis, but his parole officer denied that request. Instead, Smith's parole officer approved him to live only at a house on Goodlet Avenue. In October 2017, Smith's parole officer received hospital-discharge documents showing that Smith's address was on White Avenue. Thereafter, Smith's parole officer requested a compliance check of the White Avenue address, suspecting that Smith was in violation of his parole by living at an unapproved address.

[4] On October 27, four parole officers went to the house on White Avenue. When they arrived, they knocked on the door and identified themselves as parole officers. After about five minutes, Smith came to the door. When he opened the door, the parole officers immediately smelled marijuana. Smith was dressed only in his underwear and told the parole officers that he had just woken up. The parole officers explained why they were there, and Smith let them inside. Once inside, the parole officers went through the house to see if anyone else was inside. During this sweep, one of the parole officers saw marijuana and paraphernalia on a table in one of the rooms. After they completed their sweep and found that no one else was inside the home, the

parole officers called the Indianapolis Metropolitan Police Department to report their discovery of marijuana and paraphernalia.

[5]     Detective Christopher Cooper responded, and once he arrived, the parole officers took him to the room where they had seen the marijuana and paraphernalia. Detective Cooper then went to his police car and began applying for a search warrant. As Detective Cooper was completing the application for a search warrant, other IMPD officers arrived and waited outside the house. Once the search warrant was granted, Detective Cooper went back inside, turned on his recording device, and read the search warrant and Smith's *Miranda* rights to him. After he finished, the following exchange occurred:

> Detective Cooper: Okay, alright, want to talk to me about anything in this house right now?
>
> Smith: No.
>
> Detective Cooper: Alright, I'll come talk to you here in a minute, if you have any questions just ask me.

Ex. 25, Int. 3 at 1:24-1:27 (recorded on scene). Detective Cooper then searched Smith, who is paralyzed and confined to a wheelchair, and his chair. Inside the wheelchair's cushion, Detective Cooper found $2,960. Another IMPD officer felt a large lump inside a different seat cushion in a laundry basket. He opened the cushion and found bundles of cash totaling approximately $50,000. A third

IMPD officer searched the front closet. While he was searching, a bag of white powder, a sock, and a scale fell out of the closet. The powder was later analyzed and found to be 176.30 grams of heroin and fentanyl. IMPD officers also found numerous documents belonging to Smith, including a certificate of title to his car, a bank statement addressed to Smith, his birth certificate, and his Social Security card. *See* Exs. 19-22. Throughout the search, Smith told the officers that the money and marijuana belonged to his brother, Jamil Buchanan, and that the heroin and fentanyl was not his.

[6] At some point during the search, Buchanan arrived and told the officers that his mother (who is also Smith's mother) owns the White Avenue house and that Buchanan rented it from her. As Buchanan arrived, one of the officers remarked, in Smith's presence, "I say you snatch his brother up too since he said it's his brother's weed." Ex. 25, Int. 4 at 43:25. When Smith again claimed that the marijuana was his brother's, the same IMPD officer said, "so it's your brother's? Where's he at, snatch his ass up." *Id.* at 44:49. Detective Cooper then interviewed Buchanan. After reading him his *Miranda* rights, Detective Cooper told him what they had found inside the house. Detective Cooper also told Buchanan that Smith claimed that neither the drugs nor the money belonged to Smith. Thereafter, Buchanan and Smith got into an argument over why Smith did not change his address and, eventually, Smith admitted that "all the drugs" belonged to him. Ex. 25, Int. 5 at 30:03.

[7] Smith and Buchanan's mother then arrived at the house. Smith told her that the police had found drugs and that the drugs were his. His mother began

crying and told Smith, "you gotta get out of this house." *Id.* at 36:35-36:40. Detective Cooper told Smith's mother that Smith initially claimed that the marijuana and money belonged to Buchanan. In response, Smith began shouting at the officers, claiming that he did not say that the marijuana and money were Buchanan's. In the midst of his rant, Smith said, "I ain't answering no more questions man cause ya'll twist around my story. Ya'll making me seem like I'm on some b*llsh*t." *Id.* at 37:25. Smith continued shouting that he did not live at the house on White Avenue and that the drugs and money were not his. *See id.* at 38:55. Officers then arrested Smith and allowed Buchanan and their mother to leave.

[8] The State charged Smith with Level 2 felony dealing in a narcotic drug (heroin), Level 3 felony possession of a narcotic drug (heroin), Class A misdemeanor dealing in marijuana, and Class B misdemeanor possession of marijuana. In January 2018, the State filed a Notice of Intent to File Habitual Offender Enhancement. However, it did not actually file a charge alleging that Smith is a habitual offender at that time. Before trial, Smith filed a motion to suppress the evidence found during the searches of the White Avenue house. He argued that the parole officers' search of the house (which formed the basis for the warrant obtained by Detective Cooper) violated the Fourth Amendment to the United States Constitution. The State responded that the parole officers' search of the White Avenue house was permissible because Smith had agreed to such a search as part of his parole. *See* Suppression Hr'g Ex. 1. The trial court denied the motion to suppress. In November 2018, Smith waived his right to a jury

trial.  In December 2018, the State filed the habitual-offender charge.  There was no initial hearing and no waiver of a jury trial on the habitual-offender charge.

[9]     A month later, the case proceeded to a bench trial, where Smith objected to all of the evidence obtained from the searches of the White Avenue house.  He renewed his argument that the parole officers' search, which led to a call to IMPD and an application for a warrant, violated the Fourth Amendment to the United States Constitution.  However, the trial court disagreed and admitted the evidence.  Smith also objected to the recording of his on-scene interview during which he admitted that all the drugs were his.  The trial court overruled his objection and admitted the recording.  The court found Smith guilty of Level 2 felony dealing in a narcotic drug, Level 3 felony possession of a narcotic drug, and Class B misdemeanor possession of marijuana.  The trial court found him not guilty of Class A misdemeanor dealing in marijuana.  Regarding the habitual-offender charge, the court asked the parties, "And . . . what are we doing; is there going to be a second phase[?]"  Tr. p. 229.  Smith responded that the State had waived proceeding on the habitual-offender charge because Smith never had an initial hearing and did not waive his right to a jury trial on his habitual-offender status.  The court then held a brief initial hearing, where it didn't advise Smith that he had a right to a jury trial on the habitual-offender charge.  At the bench trial on the habitual-offender charge, Smith stipulated to his prior convictions and the court found that he is a habitual offender.

[10] At sentencing, the trial court found no mitigators and the following aggravators: (1) Smith's extensive criminal history (eight juvenile proceedings, including true findings for dealing in cocaine and battery resulting in bodily injury, and ten convictions as an adult, including seven misdemeanors and three felonies) and (2) the fact that he was on parole for Class B felony dealing in cocaine when he committed the offenses in this case. The trial court also noted that Smith had a significant amount of fentanyl and stated, "Fentanyl is an extremely dangerous drug . . . It is very addicting and people just flat out die from it." Tr. p. 247. The court merged the possession into the dealing count and imposed the maximum sentence of thirty years, enhanced by twenty years for Smith's status as a habitual offender. Of those fifty years, the trial court suspended ten years and ordered two years of probation, making Smith's executed sentence forty years. For the possession-of-marijuana conviction, the trial court sentenced Smith to 180 days to be served concurrently.

[11] Smith now appeals.

# Discussion and Decision

## I. Searches of the White Avenue House

[12] Smith renews his argument that the parole officers' search of the White Avenue house violated the Fourth Amendment. He also contends that the search warrant, based on the marijuana and paraphernalia seen by the parole officers, was invalid and therefore the trial court should have granted his motion to

suppress. Whether a search was constitutional is a question of law we review de novo. *Kelly v. State*, 997 N.E.2d 1045, 1050 (Ind. 2013).

[13] Smith's parole agreement contained the following condition:

> I understand that I am legally in the custody of the Department of Correction and that my person and residence or property under my control may be subject to reasonable search by my supervising officer or authorized official of the Department of Correction if the officer or official has reasonable cause to believe that the parolee is violating or is imminent danger of violating a condition to remaining on parole.

Suppression Hr'g Ex. 1. Smith does not contest the validity of that condition. Instead, Smith argues that the condition did not justify the parole officers' search in this case for two reasons: (1) the White Avenue house was not property under his control and (2) even if it was, there was no reasonable cause to search it.

## A. Control

[14] Smith first argues that the White Avenue house was not under his control.[1] However, there is ample evidence to the contrary. First, Smith was the only

---

[1] Notably, the State does not argue that Smith does not have standing to object to the search of the White Avenue house based on alleged Fourth Amendment violations. *See Bradley v. State*, 4 N.E.3d 831, 839 (Ind. Ct. App. 2014) ("A defendant aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by the search of a third person's premises has not had any of his Fourth Amendment rights infringed."), *trans. denied*. Instead, the State argues only that the White Avenue house was under Smith's control and that therefore the parole officers' search was authorized by the parole condition.

person inside the White Avenue house when the parole officers arrived. *See* Tr. p. 217. Next, when Smith answered the door, he was wearing only underwear and told the parole officers that he had just woken up. *See id.* at 9. Smith then allowed the parole officers inside the house. *See id.* at 26. Moreover, he actually admitted at trial that he was "in control of the house" when the parole officers arrived. *Id.* at 218. Finally, there were numerous documents belonging to Smith found inside the White Avenue house. *See* Exs. 19-22. All of this shows that Smith was in control of the White Avenue house when the parole officers searched it. As such, the trial court did not abuse its discretion by finding that the White Avenue house was subject to search pursuant to the parole condition.

## B. Reasonable Cause

Smith also argues that there was no reasonable cause to search the White Avenue house pursuant to the parole condition. Reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, but it still requires at least a minimal level of objective justification and more than an inchoate and unparticularized suspicion or "hunch" of criminal activity. *State v. Schlechty*, 926 N.E.2d 1, 7 (Ind. 2010), *reh'g denied*.

One condition of Smith's parole was that he would not change his residence without notifying his parole officer. The record reveals that Smith's supervising parole officer received hospital-discharge documents that showed Smith's

address was on White Avenue—an unapproved residence. His parole officer therefore requested a compliance check, and four parole officers went to the White Avenue house. When the parole officers arrived, Smith answered the door. His presence corroborated the hospital-discharge documents showing that Smith's address was on White Avenue and gave the parole officers reasonable cause to believe that Smith was living there. Therefore, both the hospital-discharge documents and Smith's presence gave the parole officers reasonable cause to go inside and look for further evidence that Smith was living at the White Avenue house.

[17] Smith also agreed not to possess controlled substances or engage in conduct prohibited by federal or state law or local ordinance. *See* Suppression Hr'g Ex. 1. When Smith opened the door of the White Avenue house, the parole officers immediately smelled marijuana. The smell of marijuana by itself would have given the parole officers reasonable cause to go inside the house and see if Smith was violating a condition of his parole or engaged in conduct prohibited by state law.

[18] Based on the totality of the circumstances, we find that the parole officers had reasonable cause to believe that Smith was (1) violating or in imminent danger of violating a condition to remaining on parole—based on the hospital-discharge documents showing White Avenue as his address and (2) engaged in criminal activity—based on the odor of marijuana the parole officers smelled when Smith opened the door.

[19]     For all of these reasons, we reject Smith's argument that the searches of the White Avenue house violated the Fourth Amendment.[2]

# II.  Smith's Admission

[20]     Smith next argues that the trial court erred in admitting the recording of his on-scene interview, during which he admitted that "all the drugs" were his.  A trial court has broad discretion in ruling on the admission or exclusion of evidence.  *Palilonis v. State*, 970 N.E.2d 713, 731 (Ind. Ct. App. 2012), *trans. denied*.  The trial court's ruling on the admissibility of evidence will be disturbed on review only upon a showing of an abuse of discretion.  *Id.*  An abuse of discretion occurs when the trial court's ruling is clearly against the logic, facts, and circumstances presented.  *Id.*  We do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling.  *Id.* at 731-32.

## A.  Fifth Amendment

[21]     Smith first argues that the incriminating statements he made were taken in violation of his right to remain silent and that therefore the trial court should have excluded the recording of his on-scene interview.  An assertion of the right to remain silent must be clear and unequivocal, and in determining whether a

---

[2] Smith also contends that the searches violated Article 1, Section 11 of the Indiana Constitution.  In its brief, the State claims that Smith waived this issue by failing to challenge the searches under the Indiana Constitution in the trial court.  Smith did not respond to the State's claim in his reply brief.  Even if we found that this issue was not waived, the searches were reasonable under the Indiana Constitution.  *See Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005) (setting forth three-part reasonableness test for searches and seizures under the Indiana Constitution).

person has asserted their rights, the defendant's statements are considered as a whole. *Clark v. State*, 808 N.E.2d 1183, 1190 (Ind. 2004). A person must do more than express reluctance to talk to invoke his right to remain silent. *Id.* A statement that "I'm through with this," followed by continued dialogue without pausing or indicating that the defendant would no longer respond, does not unambiguously assert the right to remain silent. *Haviland v. State*, 677 N.E.2d 509, 514 (Ind. 1997).

[22] Smith alleges that he made two requests for the on-scene interview to end:

| | | |
|---|---|---|
| (1) Detective Cooper: | | Okay, alright, want to talk to me about anything in this house right now? |
| | Smith: | No. |
| | Detective Cooper: | Alright, I'll come talk to you here in a minute, if you have any questions just ask me. |
| (2) Smith: | | I ain't answering no more questions man cause ya'll twist around my story. Ya'll making me seem like I'm on some b*llsh*t. |

Ex. 25, Int. 3 at 1:24-1:27, Int. 5 at 37:25. Smith argues that each of these statements constituted an assertion of his right to remain silent.

[23] Smith's statements did not expressly invoke his right to remain silent. Regarding the first statement, when heard in context, Smith's statement is an

answer to Detective Cooper's question of whether there is anything in the house that Smith wanted to tell him about before the police officers began their search. Although Smith answered "no," he did not hesitate to answer Detective Cooper's questions when Detective Cooper comes back to interview him after searching the White Avenue house. As to the statement, "I ain't answering no more questions man cause ya'll twist around my story," Smith made this statement while yelling profanities at the officers and seemed to be making the statement because he was agitated that the officers were telling his mother a story that he believed to be untrue. Furthermore, after both statements, Smith continued talking to the officers without pausing or indicating in any manner that he would no longer respond. For all of these reasons, the trial court did not err by admitting the recording of Smith's on-scene interview.

## B. Voluntariness of Admission

[24] Smith also argues that "his entire [on-scene interview] was the product of a coercive atmosphere, designed to overcome his free will which rendered his statement involuntary." Appellant's Br. p. 30. To be admissible, a suspect's confession must also be voluntarily given. *Palilonis*, 970 N.E.2d at 732. A confession is voluntary if it is the product of a rational intellect and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will. *Id.* Under the United States Constitution, the State must prove by a preponderance of the evidence that the defendant's confession was voluntary. *Clark*, 808 N.E.2d at 1191. The

voluntariness of a defendant's confession is determined from the totality of the circumstances. *Palilonis*, 970 N.E.2d at 732.

[25]     The record does not support Smith's claim of coercion. Detective Cooper read Smith his *Miranda* rights, and Smith said that he understood those rights. Smith did not ask for a lawyer, nor did he refuse to answer questions. The portions of the on-scene interview which Smith believes show coercion are the following:

> (1) When Buchanan arrived and one of the officers remarked, in Smith's presence, "I say you snatch his brother up too since he said its brother's weed."

> (2) When the same IMPD officer said to Smith, "so it's your brother's? Where's he at, snatch his ass up."

Ex. 25, Int. 4 at 43:25, 44:49. The statements implying that Smith's brother would be arrested were not coercive because Smith told officers that the drugs belonged to Buchanan. Smith also alleges that the police officers "deliberately ha[d] his mother hysterically confront [him]." Appellant's Br. p. 31. However, when heard in its entirety, the recording shows that Smith's mother was upset by his drug activities and by the fact that he initially told the police that the drugs belonged to Buchanan. It is clear from context that Smith's mother was not upset by Detective Cooper's interrogation. Finally, when heard in its entirety, the recording reveals that Detective Cooper did not intimidate Smith into making his admission. There is no evidence of violence, threats, promises, or other improper influences. Rather, through repeated questioning and encouragement to tell the truth, Detective Cooper elicited an admission. As

such, we find that the record supports the trial court's conclusion that Smith's admission was voluntary.

## III. Habitual-Offender Enhancement

Smith also argues that he did not personally waive his right to a jury trial for the later-filed habitual-offender charge and asks us to vacate the twenty-year enhancement. The State argues that Smith's November 20, 2018 personal waiver on the underlying felonies included a waiver of his right to a jury trial on the habitual-offender charge. The Indiana Constitution's right to a jury trial may be waived by one, and only one, person—the defendant. *Horton v. State*, 51 N.E.3d 1154, 1155 (Ind. 2016). Unless the defendant personally communicates to the judge a desire to waive that right, he must receive a jury trial. *Id.* This Court recently dealt with this issue in *Bradtmiller v. State*, 113 N.E.3d 255, 257 (Ind. Ct. App. 2018), where we held that a jury-trial waiver on the underlying charges did not apply to the later-filed habitual-offender enhancement. *See also O'Connor v. State*, 796 N.E.2d 1230, 1234 (Ind. Ct. App. 2003) ("O'Connor's waiver of her right to a jury trial was not made with sufficient awareness of the relevant circumstances surrounding its entry and its consequences so as to be deemed a voluntary, knowing, and intelligent waiver of her right to a jury trial as to the habitual offender determination.").

The State contends that this case is distinguishable from *Bradtmiller* and *O'Connor*. *See* Appellee's Br. p. 23. Specifically, it says that the advisement Smith signed stated that he waived his right to a jury trial as to all "facts, such

as a prior criminal conviction that would . . . increase the potential penalties for the charged offense," that this "is a description of a habitual-offender enhancement," and that therefore the trial court was not required to convene a jury for the habitual-offender enhancement phase of Smith's trial. *Id.* at 23. We disagree. First, like the advisements in *Bradtmiller* and *O'Connor*, the advisement in this case was given to Smith before the habitual-offender charge was filed, in fact, it was given more than a month before the habitual-offender charge was filed. *See Bradtmiller*, 113 N.E.3d at 256 (advisement given four days before habitual-offender charge filed); *see also O'Connor*, 796 N.E.2d at 1232 (advisement given more than a month before habitual-offender charge filed). Furthermore, the language cited by the State neither (1) informed Smith of his right to a jury trial on the habitual-offender charge nor (2) clearly informed Smith that he was waiving that right. Therefore, like the defendant in *Bradtmiller*, Smith's waiver was not made with sufficient awareness surrounding its entry and consequences. We therefore reverse the trial court's habitual-offender finding and the enhancement imposed thereon and remand this case so that the State can decide whether to pursue the habitual-offender enhancement.

## IV. Inappropriate Sentence

[28] Finally, Smith contends that, assuming we reverse the habitual-offender sentencing enhancement, his "remaining sentences of thirty (30) years of which ten (10) are suspended is excessive . . . [and] unreasonable." Appellant's Br. p. 35. He asks us to revise it pursuant to Indiana Appellate Rule 7(B), which provides that an appellate court "may revise a sentence authorized by statute if,

after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." "Whether a sentence is inappropriate ultimately turns on the culpability of the defendant, the severity of the crime, the damage done to others, and a myriad of other factors that come to light in a given case." *Thompson v. State*, 5 N.E.3d 383, 391 (Ind. Ct. App. 2014) (citing *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008)). Because we generally defer to the judgment of trial courts in sentencing matters, defendants have the burden of persuading us that their sentences are inappropriate. *Schaaf v. State*, 54 N.E.3d 1041, 1044-45 (Ind. Ct. App. 2016).

[29] The sentencing range for a Level 2 felony is ten to thirty years, with an advisory sentence of seventeen-and-a-half years. Ind. Code § 35-50-2-4.5. As for the nature of the offenses, Smith was convicted of dealing in heroin that contained fentanyl—an extremely dangerous drug that is very addicting and often life-threatening. *See* Tr. p. 247. And it wasn't a small amount of heroin and fentanyl that was found—but 176.30 grams, and with $50,000 at his disposal, it's clear that Smith was no low-level dealer. Regarding his character, Smith's criminal history supports his sentence. According to the pre-sentence investigation report, thirty-one-year-old Smith had been convicted of three felonies, including Class B felony dealing in cocaine, seven misdemeanors, and four juvenile adjudications, including true findings for dealing in cocaine and battery resulting in bodily injury. Appellant's App. Vol. II pp. 63-69. He was also on parole for Class B felony dealing in cocaine when he committed the

offense. Therefore, we cannot say that Smith's sentence of thirty years with ten years suspended and two years of probation is inappropriate.

[30] Affirmed in part, reversed in part, and remanded for further proceedings.

Riley, J., and Bradford, C.J., concur.